**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS BAIR, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 1:04-CV-1357** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANCIS PURCELL, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court are Defendants' Motion for Summary Judgment (Doc. No. 32), seeking

judgment in their favor on all counts of the amended complaint, and Plaintiffs' Motion for Partial

Summary Judgment (Doc. No. 34), seeking judgment in their favor on Count III of the amended

complaint.  The motions have been fully briefed and are ripe for adjudication.

I.    **BACKGROUND**[1]

In 1998, Defendant Francis "Corky" Purcell incorporated Defendant Appalachian Baking

Company, Inc. ("Appalachian Baking") under Pennsylvania law as a closely-held business

corporation.  Appalachian Baking maintains a business office and conducts business operations

in Harrisburg, Pennsylvania.  That same year, Appalachian Baking entered into a ten-year

franchise agreement with the Atlanta Bread Company International, Inc., pursuant to which

Appalachian Baking was granted exclusive development rights for Atlanta Bread Company

stores in Dauphin, Cumberland, and Lebanon counties, the State College, Pennsylvania region,

---

[1]  The following are undisputed facts unless otherwise indicated.  (Doc. Nos. 32, 36, 56, and 67.)  Defendants failed to file a separate statement of material facts in support of their Motion for Summary Judgment, in violation of Local Rule 56.1.  However, Plaintiffs construed Defendants' motion for summary judgment as including their undisputed material facts and responded where appropriate.  The Court will also construe Defendants' motion for summary judgment as including all material facts in support of their motion.

and the Baltimore, Maryland area.  At the time, Francis Purcell was the sole shareholder of

Appalachian Baking.

Prior to their involvement with Appalachian Baking, Plaintiffs Curtis Bair and Patrice

Bair (husband and wife) lived and worked in Atlanta, Georgia.  Curtis Bair and Francis Purcell

were friends and had previously worked together, primarily on a Peachtree Pretzel Time, Inc.,

franchise.  (Curtis Bair First Supp. Decl. ¶ 7, Doc. No. 55-4.)  Curtis Bair held a ten-percent

ownership in the franchise, and both he and his wife worked for the pretzel franchise operation.

(Id. ¶¶ 7-8, 20.)  During a Peachtree Pretzel Time stockholders meeting in May 1998, Francis

Purcell, his wife Norma Purcell, Plaintiffs, and Deborah and Jay James (future shareholders of

Appalachian Baking) began discussing various franchise opportunities, including Atlanta Bread

Company.  Later that year, Francis Purcell informed Plaintiffs that he had decided to pursue an

Atlanta Bread Company franchise, and Curtis Bair agreed to allow Francis Purcell to use part of

their equity in Peachtree Pretzel Time to pay the franchise fee and other start-up expenses of

Appalachian Baking.  (Id. ¶ 20.)  During this time, Plaintiffs claim that Francis Purcell

represented to them that he planned to open ten to fifteen Atlanta Bread Company stores and that

Plaintiffs would play a long-term role in the company.  (Id. ¶ 12.)

In June 2000, Francis Purcell sent Curtis Bair a packet of documents to be circulated to

potential investors in Appalachian Baking.  The packet included an offering and subscription

memorandum, a confidential descriptive memorandum, a form subscription agreement, a form

shareholder joinder, and a form shareholders agreement.  (Pl. Exs. 4.1, 4.2, 20, 22, Doc. No. 43.)

The confidential descriptive memorandum stated that the company planned to "operate one or

more retail bakery and café restaurants under the name Atlanta Bread Company" within their

2

exclusive development territory.  (Pl. Ex. 4.2.)  The form shareholders agreement, dated June 1, 2000, listed Curtis Bair as a shareholder in the company and as a member of the board of directors.[2]  (Pl. Ex. 22.)  However, this form agreement was circulated unsigned and contained blanks spaces where additional information was to be filled in later.  (Id.)  Specifically, the form agreement does not indicate how many of the total shares of the company were owned by the parties and reserved space to add the names of additional investors.  (Id.)  Plaintiffs allege that Curtis Bair signed ten copies of the form shareholders agreement, returned the copies to Francis Purcell, and became a party to the shareholders agreement.[3]  (Doc. No. 36, ¶ 47.)  Defendants dispute this allegation.  (Doc. No. 67, ¶ 47.)

        The corporate records of Appalachian Baking contain a different June 1, 2000, shareholders agreement.  (Pl. Ex. 23, Doc. No. 35.)  This agreement lists Francis Purcell as the sole shareholder of Appalachian Baking, although an attached exhibit lists Francis and Norma Purcell as co-owning one hundred percent of the company's shares, or 77 shares.[4]  (Id.)  The

---

        [2] The form shareholders agreement provides:

> The Board of Directors shall consist of three (3) members.  One member shall be Francis X.I. Purcell, or his designated representative.  The second member shall be Curtis Bair.  The third member shall be one representative of the Individual Investors and who shall be elected to serve on the Board by a majority vote of the Individual Investors.  In the event Curtis Bair ceases to be a shareholder, Purcell may designate another shareholder to be a director.

(Doc. No. 35, Ex. 22, § 2.02.)  The agreement further provides that a "Member of the Board of Directors must be a SHAREHOLDER."  (Id. at § 2.03.)

        [3] Notably, Curtis Bair did not, in fact, become a shareholder until 2001.  (Doc. No. 36, ¶ 28); (see also Pl. Ex. 16) (Curtis Bair's share certificate issued August 8, 2001).

        [4] Both versions of the shareholders agreement value each share of stock at $17,000.

agreement is signed by Francis and Norma Purcell, as witnessed by their daughter Jessica Purcell.[5]  (Id.)  Notwithstanding the other differences between this agreement and the form shareholders agreement contained in the packet of documents provided to potential investors, this agreement still listed Curtis Bair as a member of the board of directors and provided that all board members must be shareholders.  (Id. §§ 2.02-2.03.)  Curtis Bair signed neither this agreement nor a joinder agreement.  Defendants allege that they asked Curtis Bair to sign, but that he refused.  (Doc. No. 67, ¶ 53; see also Stuart Sacks Affidavit ¶¶ 5-6, Def. Ex. Y, Doc. No. 60-3. )  Plaintiffs allege that the first time Curtis Bair was informed that he was not a party to the shareholders agreement was on December 12, 2003, during the meeting in which he was voted off the board of directors.  (Doc. No. 36, ¶¶ 54, 94.)

On June 7, 2000, Appalachian Baking entered into a ten-year lease for a restaurant location in Harrisburg, Pennsylvania.  On June 20, 2000, Robert and Lori Green – friends of the Purcells – executed a shareholder joinder to the Appalachian Baking shareholders agreement and agreed to purchase six shares of the company's stock for $100,000, or approximately $16,666 per share.  On July 28, 2000, Deborah and Jay James – Norma Purcell's sister and brother-in-law – executed a shareholder joinder to the Appalachian Baking shareholders agreement and agreed to purchase two shares of the company's stock for $40,000, or $20,000 a share.  Appalachian Baking issued the above shares of stock on February 5, 2001.  On August 8, 2001, the company issued Curtis Bair fifteen shares of stock at no price.  (Doc. No. 36, ¶ 28.)

On February 5, 2001, Norma Purcell became co-owner of Francis Purcell's majority

---

[5]  In September 2001, Jessica Purcell married Oliver Kiely.  (Doc. No. 36, ¶ 24.)
Throughout this opinion, the Court has generally referred to Jessica by her married name.

shareholding in Appalachian Baking.  (Doc. Nos. 36, ¶ 12; 67, ¶ 12.)

The parties agree that on May 22, 2001, Appalachian Baking held its first shareholders and board meeting in Las Vegas, Nevada, during which the officers and directors of the company were elected.  (Doc. Nos. 36, ¶ 30; 67, ¶ 30.)  The parties further agree that the company's records contain no minutes from the May 22, 2001, meeting; rather, the corporate records indicate that the company's officers and directors were elected at a shareholders meeting held on December 20, 2001.  (Pl. Ex. 18, Doc. No. 35.)  According to the minutes, Francis Purcell, Norma Purcell, and Curtis Bair were elected as directors of the company, and the directors elected the following officers: Francis Purcell, president and treasurer; Norma Purcell, vice president; and Curtis Bair, secretary.  (Id.)

Appalachian Baking's first and only Atlanta Bread Company restaurant ("the restaurant") opened in July 2001 with John Krulock as store manager.  Despite the successful opening, John Krulock became unhappy with his position.  Shortly after the opening, Curtis Bair quit his job in Atlanta and relocated to Pennsylvania to assist with operating the restaurant, under the title of vice president of store operations.[6]  Patrice Bair remained in Georgia to sell their house and coordinate their move to Pennsylvania.  After joining her husband in Harrisburg, Patrice Bair began working at the restaurant as a catering coordinator in August 2001.

The record indicates that in early 2002, Francis Purcell and Curtis Bair began to disagree about the direction of the company.  Curtis Bair expected the company to grow quickly and open additional restaurant locations throughout the exclusive development territory.  However, on

---

[6] The parties dispute whether Curtis Bair moved to Pennsylvania at Francis Purcell's request.

April 9, 2002, Francis Purcell informed Curtis Bair that he was not planning to open any more restaurants and wanted to retire from the company.  In early May 2002, Francis Purcell announced his intention to sell his and his wife's controlling interest in the company to his daughter, Jessica Kiely.

Plaintiffs allege that on May 2, 2002, Francis Purcell offered to purchase Curtis Bair's shares of stock in the company for $203,000, or approximately $13,533 per share.  (Doc. No. 36, ¶ 72.)  Plaintiffs claim that Curtis Bair verbally accepted Purcell's offer the same day.  (Id. ¶ 73.)  Defendants contend that Curtis Bair offered to have his stock redeemed by the company for $203,000, but an agreement was never finalized.

On May 10, 2002, Francis Purcell prepared a stock-purchase letter addressed to Deborah and Jay James, and Lori Green,[7] wherein Francis Purcell stated that he was planning to purchase Curtis Bair's shares for $203,000, and sell his and his wife's controlling shares to Jessica Kiely for $200,000 plus assumption of the corporation's current debt of over $425,000.  In the letter, Francis Purcell offered Lori Green and the Jameses the following four options:  (1) purchase a proportional share of Curtis Bair's 15% interest; (2) purchase a proportional share of Francis Purcell's 77% interest; (3) sell their shares to the company for their initial purchase price plus 10% interest compounded over two years; and/or (4) keep their current ownership in the company.  (Pl. Ex. 34, Doc. No. 35.)  Lori Green and Deborah and Jay James agreed to sell their shares to Appalachian Baking.

After Curtis Bair received a copy of the above-mentioned letter, he discussed with Francis Purcell the option of purchasing the restaurant or Purcells' controlling shares.

---

[7]  Robert Green died and left his interest in his shares to his wife, Lori Green.

Defendants argue that these negotiations amounted to a series of offers and counteroffers for the redemption of Curtis Bair's own stock and the proposed purchase of control of the company. (Doc. No. 67, ¶ 74.1.)  Plaintiffs characterize the negotiations as discussions during which Curtis Bair never abandoned or modified his earlier acceptance of the $203,000 stock buy-out offer. (Doc. No. 36, ¶ 74.1.)  Although the above letter was not addressed to him, on June 24, 2002, Curtis Bair attempted to memorialize his understanding of the stock-purchase agreement he allegedly had with Francis Purcell by handwriting "I Curtis Bair elect to sell my shares under option A: sell my shares for $203,000" along the bottom of the letter, signing it thereafter, and creating a new option on the attached form.  (Pl. Ex. 35, Doc. No. 35.)  Curtis Bair sent a copy of this marked letter back to Francis Purcell.

On July 20, 2002, Appalachian Baking held a joint meeting of the shareholders and members of the board of directors.  At the meeting, Francis Purcell voted his and Norma Purcell's shares, and the shares of Lori Green by proxy, for the company to redeem Ms. Green and the James' shares at the price specified in the May 10, 2002, letter.  Francis Purcell also voted his and Norma Purcell's shares, and the shares of Lori Green by proxy, against redemption of Curtis Bair's stock.  Curtis Bair offered to sell his shares to the other shareholders, but each declined his offer.

In August 2002, Curtis Bair's position was eliminated and his employment with the company was terminated.[8]  That same month, Patrice Bair's position was also eliminated, and she was terminated from employment.  In September 2002, Francis Purcell, on behalf of

---

[8]  The parties dispute whether Curtis Bair was offered and then refused an alternative position as store manager of the restaurant when his position as vice president of store operations was eliminated.  (Doc. Nos. 36 and 67, ¶¶ 84, 86.)

Appalachian Baking, terminated the company's exclusive development rights agreement with Atlanta Bread Company International.

In January 2003, Francis Purcell requested that Curtis Bair sign two letters of resignation prepared by Purcell, one seeking Bair's resignation from the board of directors and the other seeking his resignation as corporate secretary. Bair refused to sign either letter. On November 13, 2003, Curtis Bair issued a letter demanding that the company or Francis Purcell purchase his 15 shares of stock for $203,000 pursuant to their stock buy-out agreement, and that the company satisfy the unpaid wages owed to Patrice Bair. A few days thereafter, Francis Purcell directed the company's attorney to schedule a combined special meeting of the company's shareholders and board of directors. At that meeting, Francis Purcell moved to amend section 4.03(a) of the company's bylaws to reduce the number of members on the board of directors from three to two. Curtis Bair objected to the amendment. However, Francis Purcell voted his and his wife's controlling interest in the company in favor of the amendment and the motion carried. Francis Purcell then moved for nomination of members to fill the two seats on the board of directors. Francis Purcell nominated himself and his daughter Jessica Kiely and then voted his and his wife's controlling interest in the company in favor of the nominations. Francis Purcell then nominated and voted for the following officers: himself as president and treasurer; Oliver Kiely as vice-president; and Jessica Kiely as secretary. Curtis Bair attempted to object to the voting, but was advised that he was not entitled to participate in the election of officers since he was no longer a member of the board of directors.

As of the date the motions and related briefs were filed, Curtis Bair continues to hold his 15 shares of Appalachian Baking. The company has not declared any dividends, and Curtis Bair

receives no salary from the company since he no longer holds any position with Appalachian Baking, either as an employee, director, or officer.

## II.    STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). A factual dispute is material if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 249. The evidence presented must be viewed in the light most favorable to the non-moving party. Id. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. This standard does not change by virtue of cross-motions being presented. United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, the nonmoving party may not simply sit back and rest on the allegations in the complaint. Instead, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett,

477 U.S. 317, 324 (1986) (internal quotations omitted).  The evidence must be viewed in the light most favorable to the nonmovant.  See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or speculative.  Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   DISCUSSION

Plaintiffs initiated the above-captioned matter by filing a complaint on June 23, 2004. (Doc. No. 1.)  On August 12, 2004, Plaintiffs filed an amended complaint.  (Doc. No. 4.)  In their amended complaint, Plaintiffs allege the following claims in twelve separate counts:  breach of the stock buy-out agreement; breach of employment contract; breach of fiduciary duties; negligent misrepresentation; intentional misrepresentation; equitable estoppel; violation of the Pennsylvania Wage Payment and Collection Law; unjust enrichment; two counts of aiding and abetting; civil conspiracy; and punitive damages.  (Id.)  On July 6, 2005, Defendants moved for summary judgment on all counts (Doc. No. 32), and two days later, Plaintiffs moved for partial summary judgment on Count III, their claim against Francis and Norma Purcell for breach of fiduciary duties (Doc. No. 34).  The Court will address the various counts in the order in which

they appear in the amended complaint.

**Count I: Breach of Buy-out Agreement**

In Count I, Plaintiffs allege that Francis Purcell, Norma Purcell, and Appalachian Baking breached an oral agreement with Curtis Bair to purchase his 15 shares of the corporation for $203,000.[9]  (Doc. No. 4.)  Curtis Bair testified that Francis Purcell made the offer on May 2, 2002, and Bair accepted the offer the same day.  (Bair Dep. at 300; Curtis Bair's First Supp. Decl. ¶ 34.)  Plaintiffs also point to the May 10, 2002, memorandum sent to Lori Green and Jay and Deborah James, wherein Francis Purcell wrote that he was "planning to purchase the sock of Curtis Bair representing 15% of the company for $203,000[]" and giving the other stockholders an opportunity to match his offer.  (Pl. Exs. 34-35, Doc. No. 35.)  Plaintiffs further contend that on or about July 22, 2002, Defendants Francis and Norma Purcell assured the Bairs that they would complete the buy-out agreement by the end of 2002.  (Curtis Bair First Supp. Decl. ¶ 37; see also Doc. No. 4, at 24-25.)  Defendants argue that even if Francis Purcell offered to purchase the shares, Curtis Bair rejected the offer and submitted a counteroffer.  (Doc. No. 33, at 30-31; Francis Purcell Affidavit, ¶ 10, Def. Ex. B, Doc. No. 32-2.)

There appears to be a genuine factual dispute as to whether Francis Purcell agreed to purchase Curtis Bair's 15 shares, and whether he did so in his individual capacity or on behalf of the corporation.  (Pl. Ex. 9, Francis Purcell's Dep. at 20-21; Doc. No. 36, ¶ 72.)  The parties also

---

[9]  In Pennsylvania, there is no requirement that a contract of this type be in writing. 13 Pa. Cons. Stat. § 8113 ("A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.").

dispute whether Curtis Bair accepted the $203,000 offer or made a counteroffer, thereby rejecting the original offer.  See Yarnell v. Almy, 703 A.2d 535, 539 (Pa. Super. Ct. 1997) ("A reply [to an offer] which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the offer. . . . [I]t is well established that the acceptance of any offer or counter-offer must be unconditional and absolute") (citations and internal quotations omitted).  A reasonable jury could credit Curtis Bair's testimony, buttressed by the May 10, 2002, memorandum, and find that a valid buy-out agreement existed between Curtis Bair and Francis Purcell, on behalf of himself or on behalf of Appalachian Baking.  Accordingly, Defendants' motion for summary judgment on this count as to Francis Purcell and Appalachian Baking must be denied.

On the other hand, the record does not support a finding by a reasonable jury that Norma Purcell had any involvement in the stock buy-out agreement.  Plaintiffs do not allege that Norma Purcell offered to purchase Curtis Bair's shares in her individual capacity.  In fact, the parties agree (to some extent) that Norma Purcell resisted becoming involved with corporate matters. (Doc. Nos. 55, at 17-18; 33, at 9-10.)  It appears that Plaintiff implicates Norma Purcell in this count only because she jointly owned a majority interest in the corporation, not because she had any personal involvement with the alleged agreement.  (Doc. No. 55, at 28-30.)  Because the Court will not pierce Appalachian Baking's corporate veil to hold Norma Purcell individually liable based on her investment status (discussed in more detail below), the Court will grant summary judgment on this count in her favor.

**Count II: Breach of Employment Contract/Additional Consideration**

In Count II, Plaintiffs allege that Appalachian Baking, Francis Purcell, and Norma

Purcell breached "long-term employment agreement[s]" with Curtis and Patrice Bair when

Defendants terminated, or allowed to be terminated, the Bairs' positions with the corporation

without cause.  (Doc. No. 4, ¶¶ 88, 92-93.)  Defendants argue that no such employment

agreement existed and that Plaintiffs were employed at will.  (Doc. No. 33, at 25.)

There is a strong presumption of employment-at-will under Pennsylvania law for all

employer-employee relationships.  Murray v. Commercial Union Ins. Co., 782 F.2d 432, 435 (3d

Cir. 1986).  Under the at-will employment doctrine, an employee or employer can end the

employment relationship at any time for any reason.  Id.  The presumption of at-will employment

can be overcome by showing that there is an express contract between the parties, with a

provision stating that an employee can only be terminated "for cause."  Scott v. Extracorporeal,

Inc., 545 A.2d 334, 336-37 (Pa. Super. Ct. 1988).

An "implied-in-fact" contract can also suffice if additional consideration passed from the

employee to the employer "from which the court can infer the parties intended to overcome the

at-will presumption."  Raines v. Haverford Col., 849 F. Supp. 1009, 1012 (E.D. Pa. 1994) (citing

Ruzicki v. Catholic Cemeteries, Inc., 610 A.2d 495, 497 (Pa. Super. Ct. 1992)).  The

presumption of at-will employment may be overcome by a showing that the employee provided

additional consideration to the employer and that termination of employment would result in

great hardship or loss to the party known to both employer and employee when the contract was

made.  Darlington v. Gen. Elec., 504 A.2d 306, 314 (Pa. Super. Ct. 1986), overruled on other

grounds by Clay v. Advanced Computer Applications, Inc., 559 A.2d 917 (Pa. 1989).  One type

of consideration often discussed is the relocation of an employee, particularly when

accompanied by relocation of a family.  Shaffer v. BNP/Cooper Neff, Inc., No. 98-71, 1998 U.S.

13

Dist. LEXIS 14013, 1998 WL 575135, at *4 (E.D. Pa. Sept. 4, 1998) (collecting cases).  Other

relevant factors include abandonment of other job opportunities and the sale of a home.  Marsh

v. Boyle, 530 A.2d 491, 494 (Pa. Super. Ct. 1987).

      Under Pennsylvania law, oral representations as to the predicted duration of employment

do not modify the at-will presumption.  Marsh v. Boyle, 530 A.2d 491, 494 (Pa. Super. Ct. 1987)

(stating that "the employer's assurances that Appellant would be working as publisher 'for at

least two years' was not sufficiently definite to take the agreement out of the at-will employment

presumption"); see also Engstrom v. John Nuveen & Co., Inc., 668 F. Supp. 953, 959 (E.D. Pa.

1987) ("The contractual provision necessary to overcome the at-will presumption must be for a

specific and definite term, not vague or conclusory"); Braun v. Kelsey-Hayes Co., 635 F. Supp.

75, 77 (E.D. Pa. 1986) (holding that verbal representations that plaintiff would be employed so

long as he performed his job satisfactorily did not modify at-will status).

      The determination of whether such factors constitute sufficient consideration to

overcome the at-will presumption is a jury question.  Cashdollar v. Mercy Hosp. of Pittsburgh,

595 A.2d 70, 73 (Pa. Super. Ct. 1991).  The Court may only rule on the issue when the record

evidence "is so clear that no reasonable [person] would determine the issue before the court in

any way but one[.]"  Shaffer, 1998 WL 575135, at *7 (quoting Darlington, 504 A.2d at 312); see

also Martin v. Safeguard Scientifics, 17 F. Supp. 2d 357, 369 (E.D. Pa. 1998) (same).  Here,

Plaintiffs have presented evidence from which a jury could find that Appalachian Baking

received sufficient "additional consideration" to overcome the presumption that Plaintiffs were

at-will employees.  For example, Plaintiffs contends that, shortly after the restaurant opened,

Francis Purcell asked Curtis Bair to relocate to Harrisburg as quickly as possible and that, in

light of this request, Curtis Bair resigned from his job in Georgia and promptly moved to Harrisburg, leaving his wife behind to pack up their belongings and sell their house. (Doc. No. 36, ¶¶ 37-41.) Because of the need to relocate quickly, Plaintiffs sold their home in Georgia in a compressed time frame and under distressed conditions. (Curtis Bair Dep. at 244, 246, Doc. No. 55-3, Ex. 1); (Curtis Bair First Supp. Decl. ¶ 26., Doc. No. 55-4, Ex. 2). In addition to the circumstances surrounding their relocation, Plaintiffs claim that they turned down other employment offers in order accept employment at Appalachian Baking. (Curtis Bair First Supp. Decl. ¶ 23.1.) Plaintiffs have also introduced evidence which, if believed, would support a finding that Plaintiffs "c[a]me to the employment relation with bargaining strength greater than that of the usual employee." Darlington, 504 A.2d at 314; (E.g. Curtis Bair First Supp. Decl. ¶ 14) ("The Purcells . . . said that they would not be able to pursue the new venture without us. . . ."); (id. ¶ 20) (Curtis Bair had agreed to permit the Purcells' use of $70,000 of the equity in Peachtree Pretzel Time, Inc., a company in which Curtis Bair owned a 10% interest, in order to pay the franchise fee and related start-up costs for Appalachian Baking). In light of the evidence of Plaintiffs' relocation, the distressed sale of their home, their decision to forego other employment opportunities, and their arguably stronger bargaining power than the average employee, a jury could find that Plaintiffs provided "additional consideration," indicating that the parties intended to overcome the at-will presumption. Accordingly, Defendants' motion for summary judgment on Count II as to Appalachian Baking will be denied.

Lastly, Defendants argue that no cause of action exists in Count II against Francis and Norma Purcell in their individual capacities, generally or by virtue of their status as majority co-shareholders. Defendants persuasively contend that, if an employment agreement existed, it

existed between Plaintiffs and Appalachian Baking, and to the extent that Francis and Norma Purcell acted, they acted under the role as corporate officials in order to secure employees for Appalachian Baking.  (Doc. No. 33, at 16.)  Plaintiffs counter that the Purcells "assumed a personal obligation in the contract itself" when they failed to disclose that they were acting on behalf of the corporation.  (Doc. No. 55, at 19.)  The Court finds this argument to be without merit.  The record is replete with documentation that the Bairs were employed and paid by Appalachian Baking, not the Purcells.  (Def. Exs. L & M, Doc. No. 32-3) (Curtis and Patrice Bair's W-2 and unemployment compensation notices listing Appalachian Baking as their employer); (Appalachian Baking's admissions, Pl. Ex. 17, at 1-2).  No reasonable jury could find, based upon this record, that an employer/employee relationship existed directly between the Purcells and Bairs outside of the corporation.  Thus, in order to recover from Norma or Francis Purcell individually, Plaintiffs would have to establish that piercing the corporate veil is warranted.

Plaintiffs contend that individual liability should attach to Norma and Francis Purcell because the circumstances of this case require that the corporate form – and the protections that this form generally affords shareholders – be disregarded.  Plaintiffs argue that Appalachian Baking was so dominated and controlled by the Purcells, particularly Francis Purcell, that the corporation was not a separate legal entity; rather, it was a sham, a mere alter-ego of the majority shareholders.  (Doc. No. 55, at 14-19.)

Pennsylvania generally recognizes that the corporate veil may be pierced "whenever it is necessary to avoid injustice."  Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa. Super. Ct. 1987).  However, there is a strong presumption in Pennsylvania against piercing the corporate veil.

16

Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1994) (quoting Wedner v.

Unemployment Board, 296 A.2d 792, 794 (Pa. 1972)).  Although there is no definitive test for

piercing the corporate veil under Pennsylvania law, courts are instructed to apply a totality-of-

the-circumstances test when determining whether to impose individual liability on a shareholder.

First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 604 (Pa. Super. Ct. 1991).  In Ashley

v. Ashley, 393 A.2d 637 (Pa. 1978), the Pennsylvania Supreme Court set forth the following

principles to guide the determination of whether the corporate form should be disregarded and

whether one individual or corporation should be deemed the alter-ego of another:

> This legal fiction of a separate corporate entity was designed to serve
> convenience and justice, and will be disregarded whenever justice or
> public policy demand and where rights of innocent parties are not
> prejudiced nor the theory of the corporate entity rendered useless.
> We have said that whenever one in control of a corporation uses that
> control, or uses the corporate assets, to further his or her own
> personal interests, the fiction of the separate corporate entity may
> properly be disregarded.

Ashley, 393 A.2d at 641 (citations omitted); see Ragan v. Tri-County Excavating, 62 F.3d 501,

509 (3d Cir. 1995).

The Third Circuit has held that the factors to be considered under Pennsylvania law with

respect to the alter-ego theory include, but are not limited to:  failure to observe corporate

formalities; nonpayment of dividends; insolvency of the debtor corporation; siphoning funds

from the corporation by dominant shareholders; nonfunctioning of other officers and directors;

absence of corporate records; whether the corporation is a mere facade for the operations of a

common shareholder or shareholders; and gross undercapitalization.  Eastern Minerals &

Chemicals Co. v. Mahan, 225 F.3d 330, 333 n.7 (3d Cir. 2000).  The Third Circuit observed that:

> Pennsylvania, like New Jersey, does not allow recovery unless the

17

> party seeking to pierce the corporate veil on an alter ego theory
> establishes that the controlling corporation wholly ignored the
> separate status of the controlled corporation and so dominated and
> controlled its affairs that its separate existence was a mere sham. . . .
> In other words, both Pennsylvania and New Jersey require a
> threshold showing that the controlled corporation acted robot- or
> puppet-like in mechanical response to the controller's tugs on its
> strings or pressure on its buttons.

Eastern Minerals, 225 F.3d at 334 (quoting Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 14-15 (3d

Cir. 1990)).  Notably, the fact that a corporation's stock is owned entirely by one person, Lumax,

669 A.2d at 895 (citing College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d

200, 207 (Pa. 1976)), or owned by members of the same family, Warren v. Motion Picture

Machine Operators, 118 A.2d 168, 170 (Pa. 1955), does not make a corporation any less valid.

Guided by these considerations and upon review of the totality of the circumstances, the Court

finds that piercing the corporate veil to hold Norma Purcell liable is not warranted; however,

material questions of fact remain as to whether liability should extend to Francis Purcell

personally.

> Plaintiffs argue that Appalachian Baking acted as a mere alter-ego to Francis and Norma

Purcell, and in support of this contention, they have produced evidence that corporate formalities

were not followed, officers and directors were nonfunctioning, dividends were never paid, and

corporate records were not always properly maintained.  (Doc. No. 55, at 16-18.)  For instance,

Plaintiffs contend that Francis Purcell disregarded the shareholders agreement and the corporate

bylaws when he transferred several of his shares in the corporation to the Kielys and when he

voted to reduce the number of corporate directors.  (Id. at 16); (see Bylaw § 2.02(b)) (providing

for notice to shareholders relating to action on bylaws).  Defendants, however, dispute this

characterization of Francis Purcell's actions and of the underlying factual predicates.

18

Defendants note, for example, that while Curtis Bair was a shareholder, he was never a signatory to the shareholders agreement contained in the corporate records.  (Pl. Ex. 23.)  The Defendants point out that the optional bylaw provisions restricting the gifting of shares were never incorporated into the body of the corporate bylaws.  (Pl. Ex. 46; Def. Ex. X, Doc. No. 60-2.)[10] Also, while the corporate records expressly state that the shareholders were not provided a copy of the proposed amendment to reduce the number of board members (Pl. Ex. 13), it is unclear at this point to what extent, if any, Curtis Bair is responsible for the lack of advance notice.  (See Bylaws § 2.03, Def. X, Doc. No. 60-2) ("Written notice of every meeting of the shareholders shall be given by, or at the direction of, the secretary . . .").  Defendants do, however, concede that no annual shareholders meeting was held in September 2003, contrary to the Company's bylaws, and that Norma Purcell exercised little to no authority during her tenure as vice-president and as member of the board of directors.  (E.g. Doc. No. 67, ¶ 54.1) (stating that Norma "was not involved in the operation of the business").

The Court notes that the overwhelming majority of Plaintiffs' allegations and evidence relate to the actions of Francis Purcell, not his wife.  While the record demonstrates that Francis Purcell exercised tremendous control over the operations of Appalachian Baking, the same cannot be said of Norma Purcell.  Plaintiffs themselves point out:

> Norma Purcell, who was a director (2001 to 2002) and the Company's vice president (2001 to December 2003) admitted that she really did not function in those positions . . .  Norma Purcell was vice-president "in title only" . . . [and] did not "get into the business

---

[10]  The Court notes that it was never provided a full and complete copy of the corporate bylaws including both the "main" provisions and the "optional" provisions as they would have appeared in the corporate record book.  Plaintiffs provided only those provisions they believed to be relevant, and Defendants included none of the "optional" provisions in their exhibits.

> side" . . .   Norma Purcell admitted that it was her husband who was
> really in charge of the Company. . .   Plainly, Norma Purcell was a
> non-functioning officer and director because she did nothing more
> than go along with her husband.

(Doc. No. 55, at 21-22) (internal citations to the record omitted).  After due consideration of the

record and the parties' arguments, the Court finds that Appalachian Baking was not the alter-ego

of Norma Purcell.  The current state of the record, however, does not lend itself to a

determination whether the corporate veil should be pierced to hold Francis Purcell, the clearly

dominant majority co-shareholder, personally liable.[11]  Accordingly, summary judgment on this

count will only be entered in favor of Norma Purcell.

### Count III: Breach of Fiduciary Duties[12]

In Count III, Plaintiffs allege that Francis and Norma Purcell, the majority shareholders

of Appalachian Baking, violated the fiduciary duties they owed to Curtis Bair, as a minority

shareholder.  Both Plaintiffs and Defendants have moved for summary judgment on this claim.

Majority shareholders have a fiduciary obligation to minority shareholders of the "utmost

good faith and loyalty."  Orchard v. Covelli, 590 F. Supp. 1548, 1557 (W.D. Pa. 1984), aff'd,

802 F.2d 448 (3d Cir. 1986); see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247

F.3d 79, 100-101 (3d Cir. 2001) (A majority shareholder "is under close scrutiny, and is

---

[11]  The Court notes that, should it determine at trial that the circumstances warrant
piercing the corporate veil as to Francis Purcell, then Francis Purcell would likewise be liable on
Count I if Appalachian Baking is found to have breached the alleged stock buy-out agreement.

[12]  The amended complaint indicates that this claim is made by both Curtis and Patrice
Bair against Francis and Norma Purcell.  Plaintiffs concede that Patrice Bair cannot make a
claim for breach of fiduciary duty because she never held stock in Appalachian Baking and
therefore no duty was ever owed to her by the majority shareholders.  (Doc. No. 55, at 3; Tr. of
Oral Argument at 51-52.)  Likewise, Patrice Bair cannot state a claim for aiding and abetting a
breach of fiduciary duties, Counts IX and X.

expected to conform to the highest standards of conduct"); Ferber v. Am. Lamp Corp., 469 A.2d

1046, 1050 (Pa. 1983) ("It has long been recognized that majority shareholders have a duty to

protect the interests of the minority").  Therefore, a "policy of corporate governance which has

as its objective the denial of benefits to the minority interest runs afoul of this fairness standard

and calls to question the majority's fulfillment of its fiduciary duty to the other shareholders."

Orchard, 590 F. Supp. at 1556.  This is especially true in a closely-held corporation where shares

are not publically traded and a fair market is rarely available.  Id. at 1557.  Accordingly,

Pennsylvania courts have held that majority shareholders' duty to the minority "prevents them

from using their power in such a way as to exclude the minority from their proper share of the

benefits accruing from the enterprise."  Ferber v. American Lamp Corp., 469 A.2d 1046, 1050

(Pa. 1983) (quoting  Hornsby v. Lohmeyer, 72 A.2d 294, 298 (Pa. 1950)).  This does not mean

that majority shareholders may never act in their own interest, merely that when they do act in

their own interest, it must be also in the best interest of all shareholders and the corporation.  Id.

(citing Weisbecker v. Hosiery Wide Patents, Inc., 51 A.2d 811, 814, 817 (Pa. 1947)).

"Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not

fraudulent when the fiduciary acts to benefit himself while in the fiduciary role."

Bohler-Uddeholm, 247 F.3d at 100-101.

A majority shareholder may not use the corporate process to deny minority shareholders

the right to participate in the corporation or to "exclude minority shareholders from their proper

share of benefits accruing from the enterprise[.]"  Viener v. Jacobs, 834 A.2d 546, 556 (Pa.

Super. Ct. 2003); see Orchard, 590 F. Supp. at 1556.  A "freeze-out" occurs in a closely-held

corporation when a minority shareholder is removed from office or his power or compensation is

21

substantially diminished, in an attempt to exclude the shareholder from any meaningful role in the corporation or deny him benefits from the corporation. <u>Viener</u>, 834 A.2d at 556 (citing 15 Pa. Cons. Stat. § 1767 comment). Such an attempt by a majority shareholder to "freeze-out" or "squeeze-out" a minority shareholder constitutes a breach of this fiduciary duty. Tactics employed against a minority shareholder to effect such a "freeze-out" include, but are not limited to:

> generally oppressive conduct, the withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority stockholders, withholding information relating to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholders appraisal rights, failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making.

<u>Orchard</u>, 590 F. Supp. at 1557. The United States District Court for the Western District of Pennsylvania noted that "[t]he removed minority shareholder is frequently replaced by someone who is closely related to the majority shareholder[, a] practice . . . typical of a consolidation of power . . . ." <u>Id.</u> at 1558.[13]

Curtis Bair maintains that the conduct of Francis and Norma Purcell toward him amounted to less than "utmost good faith and loyalty." In fact, as Plaintiffs explain the events leading to this litigation, Curtis Bair's skills and expertise in the restaurant field were utilized by the Purcells until they decided that he was "dispensable" sometime between April 2002 and August 2002, and proceeded to treat him accordingly by squeezing him out of the company. (Doc. No. 44, at 20.) He contends that, among other things, the Purcells have refused to redeem

---

[13] The court further noted that this practice tends "to aggravate the psychological impact to the minority stockholder." <u>Orchard</u>, 590 F. Supp. at 1558.

his 15 shares of stock, excluded him from any meaningful role in the corporation, engaged in generally oppressive conduct, and withheld dividends.

Curtis Bair became a director and officer of Appalachian Baking in May 2001 (even though the corporate records indicate that he was elected in December 2001); he started working as vice president of store operations at the restaurant in July 2001; and he received 15 shares of Appalachian Baking in August 2001.  Although he had great hopes for his involvement in the business, by the end of 2003, Curtis Bair no longer held any position with the company and was deriving little, if any, benefit from his status as a minority shareholder.[14]  The deterioration of his relationship with the corporation and the Purcells began around April 2002 when Francis Purcell unexpectedly announced his intention to retire and "unilaterally" changed the company's ten-year plan by abandoning efforts to open additional stores.  Bair claims that, in light of this abrupt change in the business plan, he agreed to sell, and Francis Purcell agreed to purchase, Bair's 15 shares of stock.  Despite this agreement, Bair was excluded from the Appalachian Baking stock redemption process during the July 2002 shareholders' meeting.  (Doc. No. 36, ¶ 75; Pl. Ex. 12.)  During that meeting, Francis Purcell voted his and Norma Purcell's shares and the shares of the Greens (by proxy) against the redemption of Curtis Bair's shares but in favor of redemption of the Greens and James' shares.  (Id.)  Despite Bair's repeated requests during the meeting and the months thereafter, neither Appalachian Baking nor the Purcells have purchased Bair's shares.

As additional evidence to support his claim of Defendants' misconduct, Bair points to the August 2002 elimination of his position at the restaurant, which he claims was an involuntary

---

[14]  In fact, Curtis Bair points out that in 2003, he had an unfunded tax liability on his share ($28,229) of the company's income.  (Doc. No. 36, ¶¶ 136-138.)

termination.  After his termination, Jessica Kiely assumed the management role for the

restaurant, highlighting the Purcells' purported favoritism toward family members at Curtis

Bair's expense.[15]  Curtis Bair has also introduced evidence that would support a finding that

corporate formalities were not followed on certain occasions.

Then, in January 2003, Francis Purcell requested that Curtis Bair sign two letters of

resignation Purcell had prepared: one seeking Bair's resignation as corporate secretary and the

other seeking his resignation from the board of directors.  Bair, however, refused to give up his

positions as an officer and director of the corporation.  After Curtis Bair refused to resign – and

days after receiving a demand letter from Bair's attorney related to the stock buy-out agreement

and wages owed to Patrice Bair – Francis Purcell convened a special meeting of the directors and

shareholders.  When Bair received notice of the special meeting, he requested in writing that

several items be added to the meeting's agenda, but they were improperly excluded from the

meeting's agenda.[16]  The meeting was held on December 12, 2003, and during it, Purcell moved

to amend the corporate bylaws to reduce the number of corporate directors from three to two.

Over Bair's objection that he never received the notice required for shareholder action on the

bylaws (Bylaw § 2.03(a), (b); Pl. Ex. 13), the motion carried with Purcell and the Jameses voting

in favor of it.  (Pl. Ex. 13.)  Purcell then moved to nominate himself and Jessica Kiely as

---

[15]  Bair provides what he views at other examples of the Purcells' alleged  favoritism and
"self-dealing," such as their decision to have the corporation redeem family members' stock
(Deborah James was Norma Purcell's sister) at a higher rate than they were willing to purchase
his; the Purcells' willingness to sell their controlling stock to Jessica Kiely, the Greens, or the
James for $200,000 plus assumption of debt, but not to Curtis Bair at this price; the decision to
replace Curtis Bair as manager of the restaurant as an officer and director by the Kielys.

[16]  Purcell and corporate counsel dispute whether the request was received in enough time
to add the topics to the agenda.  (Doc. No. 67, ¶ 93.)

Appalachian Baking's directors and moved to nominate himself as president and treasurer, Oliver Kiely as vice president, and Jessica Kiely as secretary.  Purcell voted in favor of these nominations, all of which carried.  During the meeting certain "old business" – including the Bairs' claims for compensation and employment – "were referred the President to address for action."  (Id.)  After the meeting, Francis Purcell purportedly stated that he "will never pay Curtis Bair a penny until a judge makes him do so."  (Doc. No. 36, ¶ 110.)

Curtis Bair also notes that, despite its good financial health and status as a "mature business no longer pursuing a growth strategy requiring additional working capital," no dividends have been paid by Appalachian Baking.[17]  Defendants argue that the company is trying to grow its capital, but they do not refer to evidence controverting Bair's statement that the corporation could pay dividends.  Defendants instead argue that "shareholders do not become involved in a close corporation for the prospect of dividends," and point out that under certain circumstance is it inappropriate for a growing company to declare dividends.  (Doc. No. 61, at 11-13)  Bair seems argue that, while it may be true that shareholders do not become invovled in close corporations for the prospect of dividends,[18] the circumstances surrounding the withholding

---

[17]  With respect to dividends, Curtis Bair also claims that on July 2, 2002, Francis Purcell threatened "that [Bair's] ownership in the Company meant nothing and that he could structure the Company so that all the profits will come out in other ways and a dividend will never be paid."  (Curtis Bair First Supp. Decl. ¶ 36.)

[18]  Plaintiffs emphasize that the interest of a shareholder in a close corporation is unique:

> As a leading commentator in the field has observed: "unlike the typical shareholder in the publicly held corporation, who may be simply an investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the business and wants the privileges and powers that go with ownership.  His participation in that

of dividends in this case strengthens his argument that the Purcells have engaged in tortious behavior. After the redemption of the Greens and James' shares, the remaining shareholders were Curtis Bair, Francis Purcell, Norma Purcell, Jessica Kiely, and Oliver Kiely, who became a shareholder in 2004 (Doc. No. 36, ¶ 152). With the exception of Norma Purcell (and Bair), the current shareholders are compensated by the company as directors, officers, employees, "consultants," or some combination of the above. Because the other shareholders of the corporation do receive meaningful benefits from the corporation, Bair seems to suggests that the failure to declare dividends highlights the Purcells' efforts to treat him differently and squeeze him out.

In sum, Curtis Bair has presented evidence that, largely because of the Purcells' actions,[19]

_____

> particular corporation is often his principal or sole source of income. As a matter of fact, providing employment for himself may have been the principal reason why he participated in organizing the corporation. He may or may not anticipate an ultimate profit from the sale of his interest, but he normally draws very little from the corporation as dividends. In his capacity as an officer or employee of the corporation, he looks to his salary for the principal return on his capital investment, because the earnings of a close corporation, as is well known, are distributed in major part in salaries, bonuses and retirement benefits." (O'Neal, Close Corporations [2d Ed.], § 1.07, at pp. 21-22 [n. omitted].)

Simms v. Executer Architectural Products, Inc., 868 F. Supp. 677, 682 n.1 (M.D. Pa. 1994) (brackets in original).

[19] Defendants argue that Norma Purcell should be granted summary judgment on this claim because the actions discussed are generally those taken by her husband. However, reading the record in the light most favorable to Curtis Bair, it is clear that Norma Purcell was aware of – and, indeed, expressed concern over – the deteriorating relationship between her, her husband, and the Bairs (Norma Purcell Dep. at 15-20, Def. Ex. H, Doc. No. 32-2; see also Doc. No. 55, at 6-7), yet she took no affirmative steps to ensure that her duty to Curtis Bair – that of utmost good faith and loyalty – was satisfied. As co-owner of the majority of the shares, Norma Purcell could have objected to, and voted against, certain of the shareholder decisions that Curtis Bair

he went from being a shareholder, employee, officer, and director of Appalachian Baking, to being the only minority shareholder not related to the Purcells and not deriving a financial benefit from the company.  Based upon Bair's contentions discussed above and, particularly, Curtis Bair's status as a minority interest holder in a closely held corporation in which he has no role and receives no meaningful benefit therefrom (in either pay or dividends), a reasonable fact-finder could find that the Purcells breached their fiduciary duty to Curtis Bair by freezing him out of the company.

The Court, however, cannot say as a matter of law that Curtis Bair was frozen out, as there remain a number of factual disputes surrounding the alleged freeze out.  For example, Defendants argue that Curtis Bair is to blame, at least in part, for his current situation.  The Purcells explain that they did not deprive Curtis Bair of his employment with Appalachian Baking because they offered him different position within the company.  The Purcells contend that, because additional stores were not scheduled to be opened, it did not make sense to have a position for vice president for store operations.  (Doc. No. 61, at 15-16.)  Moreover, at the same time the store operations position was eliminated, Cutis Bair was offered the position of store manager.  (Id.)  From the Purcells' perspective, when Bair refused the alternative employment, he effectively quit.  They further explain that, contrary to Curtis Bair's presentation of the facts, the goal was not to eliminate him in order to bring in more family members: Jessica Kiely was offered the position as store manager only after it had been rejected by Bair.  (Id.)

---

contends effectuated his squeeze-out.  (See Bylaws § 3.10) (providing that the voting of jointly owned shares will be divided equally if the co-owners disagree as to how they should be voted).  In sum, genuine issues of material fact preclude the entry of summary judgment in Norma Purcell's favor on this count.

They also explain that Bair was not "removed" from the board of directors or as an officer; rather, he was not re-elected for an additional term when his original term expired.  They suggest that one reason Bair was not re-elected to these positions was his well-known desire to leave the business, as evidenced by his efforts to sell his shares to the Purcells or the company.  Furthermore, the Purcells contend that any defect in the December 2003 meeting relating to notice was at least, in part, Bair's fault since he was responsible for providing notice as corporate secretary.  The Purcells dispute Bair's claims that they or the company withheld corporate information from Bair, as he had access to the corporate records upon request, and further dispute Bair's allegations relating to his asserted rights under the shareholders agreement, as Bair chose not to sign the agreement, even after corporate counsel encouraged him to become a party to the agreement.  Thus, based on the record now before the Court, a reasonable fact-finder could likewise find that the Purcells did not breach their fiduciary duties to Bair.

Throughout their submissions, the Purcells contend that the decisions that they made were "purely" business decisions and not abuses of their majority shareholder position.  The Purcells argue that the "business judgment rule shields both Defendants from liability with respect to corporate decision."  (Doc. No. 33, at 8, 10 n.4.)  The "business judgment rule" insulates an officer or director of a corporation from liability for business decisions made: (1) in good faith; (2) where the director or officer is not interested in the subject of the business judgment; (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interests of the corporation.  Cuker v. Mikalauskas, 692 A.2d 1042 (Pa. 1997).  However, the "business judgment rule" would not

necessarily insulate Francis and Norma Purcell from liability in this case.  Curtis Bair does not

challenge the power of the corporation to manage its property and conduct its business affairs;

rather, he contends that the Purcells have, in bad faith, prevented him from having any

meaningful role in the closely held corporation and have engaged in efforts to deny him the

benefits of his status as a shareholder.  See Viener, 834 A.2d at 557 (finding that the business

judgment rule did not insulate majority shareholder from liability for his breach of fiduciary

duties); see also Orchard, 590 F. Supp. at 1558 (finding majority shareholder liable for breach of

fiduciary duty where majority shareholder engaged in a systematic effort to exclude the minority

shareholder from having a role with the corporation or deriving benefits therefrom).  As

explained by the Pennsylvania Superior Court in Viener, the "determination of this issue requires

an analysis of the equitable relationship between [the minority and majority shareholders] and,

therefore, does not implicate matters left to the business judgment of . . . corporate officers or

directors."  Id. at 557.  Accordingly, the Court will not enter summary judgment on Count III.

### Counts IV and V: Negligent and Intentional Misrepresentation

In Counts IV and V, Plaintiffs allege that Defendants Appalachian Baking, Francis

Purcell, and Norma Purcell negligently or intentionally misrepresented "employment and

business advancement opportunities" in order to induce Plaintiffs to leave Georgia and work for

Appalachian Baking.  (Doc. No. 4, at 30-34.)  Plaintiffs additionally claim that Defendants made

representations to induce Plaintiffs to continue working while "await[ing] Defendants

compliance with the Buy-Out Agreement and employment agreements."  (Id.)

In order to prevail on a claim for intentional misrepresentation, a plaintiff must establish:

"(1) a representation; (2) that is material to the transaction at hand; (3) made falsely, with

knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of

misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6)

resulting injury proximately caused by the reliance." Porreco v. Porreco, 811 A.2d 566, 570 (Pa.

2002).  To demonstrate negligent misrepresentation, a plaintiff must establish: (1) a

misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter

ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which

results in injury to a party acting in justifiable reliance on the misrepresentation.  Huu Nam Tran

v. Metro. Life Ins. Co., 408 F.3d 130, 136 n.8 (3d Cir. 2005);  Gibbs v. Ernst, 647 A.2d 882, 890

(Pa. 1994) (citing Restatement (Second) Tort § 552).  Moreover, like any action in negligence,

the plaintiff must prove that the defendant owed him a duty of care.  Id.

Plaintiffs contend that Defendants Francis and Norma Purcell made various

representations about the potential employment and business opportunities at Appalachian

Baking.  For example, during a 1997 discussion between the Purcells and the Bairs, the Purcells

represented that Curtis and Patrice Bair would play a role in the new company and the growth

plan that would be used to develop the business.  (Curtis Purcell First Supp. Decl. ¶ 7-8.)  During

this conversation, Francis Purcell represented that "if we helped make him a multi-millionaire,

then [Francis] would make sure that we would get at least $1 million," a representation that

Francis Purcell repeated on other occasions.[20]  (Id. ¶ 9.)  In other discussions occurring in late

1997 through August 1998 about the proposed new business venture, the Purcells and the Bairs

---

[20]  Notably, the evidence before the Court does not indicate whether Francis Purcell ever
reached this desired multi-millionaire status.  Plaintiffs also point to a statement by Francis that
"after we opened 10 to 15 stores, Patrice and my ownership value in the new company would be
worth over $1 million" (Curtis Bair First Supp. Decl. ¶ 12); however, it is undisputed that
Appalachian Baking has opened only one store to date.

discussed the "long-term role that [the Bairs] would play in the new company," the plan to

"open[] possibly two or three stores per year," and the projection that "in about 5 years after [the

Bairs relocated], Francis could retire and [Curtis] would take over running the company." (Id.

¶¶ 10-12.) Curtis Bair further contends that the Purcells made the following claims:

- Plaintiffs would have job security for at least ten years;
- The Purcells "always would make sure that [the Bairs] were taken care of financially;"
- Curtis Bair would always be an officer and director, be next in line to Francis Purcell, and would never be outranked by any of the Purcells' children;
- If the company sold sooner than 10 years after Curtis Bair joined it, Curtis Bair's interest would be valued over $1 million dollars;
- Plaintiffs would own at least 17% of the company;
- The Purcells would make up the difference between the sales price of the Bairs' home in Georgia and the purchase price of a house of the same square footage in the Pennsylvania/Maryland area;[21]
- Curtis Bair's starting salary would be $55,000 per year with increases when additional stores opened;

(Curtis Bair First Supp. Decl. ¶¶ 7-13); (see Doc. No .4, ¶¶ 24-25, 34); (see also Patrice Bair

Decl. ¶¶ 3-4, Doc. No. 55-11; Doc. No. 56, ¶ 64).  Initially, the Court notes that several of the

representations cited by Plaintiffs were contingent upon the occurrence of conditions precedent

which were never fulfilled, and others appear to be statements regarding certain possibilities

about the future of the company.  Indeed, certain of these statements appear to be puffery, and

---

[21]  The Court notes that Plaintiffs articulate this allegation inconsistently in their papers and discovery documents.  (Compare Doc. No. 4, ¶ 25.11, asserting that the promise was to pay the difference between the sales price of the Georgia home and the purchase price of a comparable Pennsylvania/Maryland home, with Curtis Bair First Supp. Decl. ¶¶ 26-27, suggesting that the promise was to pay the difference between the price at which the Bairs had wanted to list the Georgia home and the amount for which the Georgia home actually sold.) Plaintiffs wanted to list the Georgia home for approximately $175,000, but put it on the market at $160,000, ultimately selling it for $158,000.  Plaintiffs received $3,000 with respect to the sale of the Georgia home.  (Curtis Bair First Supp. Decl. ¶¶ 26-27.)  It appears that Plaintiffs never purchased a home in the Pennsylvania or Maryland area.  (See Norma Purcell Dep. at 110-11.)

reasonable reliance on the same is questionable.

However, assuming that these statements were, in fact, material misrepresentations, Plaintiffs have not pointed to evidence that Defendants made the representations with the requisite intent necessary to establish a claim for intentional or negligent misrepresentation.[22] See 2 Summ. Pa. Jur. 2d Torts § 16:30 ) ("[T]he mere fact that a statement as to an intention concerning future conduct is unfulfilled does not make that statement fraudulent where there is no evidence that an intention to fulfill the promise did not exist at the time the statement was made."); (see also Doc. No. 44, at 20) (Plaintiffs themselves suggest that the Purcells determined that Curtis Bair was "dispensable" "somewhere between April 2002 . . . and August 2002," which undermines their allegations that Defendants knew or should have known certain representations to be false when made in late 1997 through the Bairs' July/August 2001 relocation).

During the time preceding Plaintiffs' relocation to Pennsylvania to work at the restaurant, the parties generally agree that the "Bairs enjoyed a long-standing friendship and a business relationship with the Purcell family," (Oral Argument Tr. at 5; accord Doc. No. 36, ¶ 32; Norma Purcell Dep. at 9-12, Def. Ex. H, Doc. No. 32-2), and that it was not until early 2002, after the Bairs had begun working at Appalachian Baking, that this relationship began to deteriorate (see, e.g., Norma Purcell Dep. at 9-12, 15-21).  The Bairs and the Purcells had taken trips together; they had been involved in other business ventures together, id.; and the representations or statements were made in the context of discussions about what they hoped would be another

---

[22]  Indeed, with respect to the intentional misrepresentation claim, the amended complaint itself is devoid of any allegation that Defendants made these statements with the knowledge that the representations were false or with reckless disregard to their falsity.

shared business success.  (See generally id.; Curtis Bair Decl.; Curtis Bair First Supp. Decl.; Patrice Bair Supp. Decl.)  The record shows that at the time the Purcells made these statements, they were talking with friends and colleagues about what they anticipated would be a successful business venture for all involved.  Plaintiffs have not pointed to evidence suggesting otherwise; in other words, Plaintiffs have not pointed to evidence from which a jury could find that the Defendants made these pre-employment representations knowing that they were false, with reckless disregard as to their falsity, or under circumstances in which Defendants should have known the statements were false.

Other evidence relating to the various pre-employment statements reinforce the Court's finding that Francis and Norma Purcell lacked the requisite intent at the time they made the statements at issue.  For instance, the Bairs claim that Purcells represented that "possibly two or three stores per year" would be opened (Curtis Bair First Supp. Decl. ¶ 12), and that they relied to their detriment upon this statement and others relating to the company's proposed growth plan.  In fact, in September 1998, Francis Purcell negotiated a contract between Appalachian Baking and the Atlanta Bread Corporation which specifically imposed a duty on Appalachian Baking to "open at least three (3) franchise locations per twelve (12) consecutive months, with the first month commencing upon the opening of the Store to be opened pursuant to this Franchise Agreement."  (Franchise Agreement ¶ 3, Pl. Ex. 3.)  That Francis Purcell obligated Appalachian Baking to a contract calling for this type of expansion severely undercuts the Bairs' assertion that Francis Purcell made these pre-employment representations relating to the company's growth plan knowing they were false or under circumstances in which he should have known they were false.

33

Plaintiffs also contend that the Purcells and Appalachian Baking made intentional or

negligent misrepresentations after Plaintiffs were working at the restaurant to induce them "to

continue to work at the company . . . and await Defendants['] compliance with the buy-out

agreement and employment agreements."  (Doc. No. 4, ¶¶ 106, 113).  Specifically, the amended

complaint states that in or around July 2002, Francis Purcell represented that he would purchase

Curtis Bair's shares pursuant to an oral buy-out agreement after he concluded the purchase of the

other shareholders' shares; Plaintiffs allege that they relied upon this representation in deciding

to continue working at the restaurant, only to be terminated a month later.[23]  (Id. ¶¶ 60-63); (see

also Doc. No. 55. At 36-37).  Other than claiming that they detrimentally relied upon this July

2002 statement, Plaintiffs do not point to any specific injury proximately caused by their reliance

on the statement.  For example, Plaintiffs have not shown that they declined other business

opportunities between July and August 2002, or that they otherwise changed their position to

their detriment in reliance on the statement.  Because Plaintiffs have not advanced evidence to

support their allegation how they were injured by this alleged misrepresentation, the claim must

fail, and summary judgment will be entered in Defendants' favor.

### Count VI: Equitable and Promissory Estoppel

In Count VI, Plaintiffs seek to estop Defendants Appalachian Baking and Francis and

Norma Purcell "from denying the existence of the employment and stock buy-out agreements

---

[23]  Although the amended complaint never references the shareholders agreement, Plaintiffs suggest that their misrepresentation claims also rest upon a June 2000 statement by Francis Purcell that Curtis Bair was a party to the shareholders agreement.  (Doc. No. 55, at 33, 37); (see also Curtis Bair Decl. ¶¶ 15-21).  It is undisputed, however, that Curtis Bair did not become a shareholder until 2001.  (Doc. No. 36, ¶ 28); (see also Pl. Ex. 18, Curtis Bair's stock certificate dated August 8, 2001).  Because Curtis Bair was not yet a shareholder, it is questionable whether he could justifiably rely on this June 2000 statement.

between the parties."[24]   (Doc. No. 4, ¶ 124.)  Plaintiffs captioned Count VI as an "equitable

estoppel" claim.  (Doc. No. 4, at 34.)  However, equitable estoppel is raised as an affirmative

defense or as grounds to prevent a defendant from raising a particular defense, it cannot be

pleaded as a separate cause of action.  Carlson v. Arnot-Ogden Memorial Hospital, 918 F.2d

411, 416 (3d Cir. 1990); Paul v. Lankenau Hospital, 543 A.2d 1148, 1152 (Pa. Super. Ct. 1988),

rev'd on other grounds, 569 A.2d 346 (Pa. 1990) (stating that equitable estoppel "may prove

useful during litigation, but it is ancillary by nature.  Though it may aid a party in recovering

upon his legal theory, it may not serve as a substitute for such a theory").  Perhaps because of

this, Plaintiffs now argue that their estoppel claim encompasses both equitable and promissory

estoppel causes of action.  (Doc. No. 55, at 31 n.8.)

      Promissory estoppel permits courts to enforce promises that are unsupported by

consideration in order to remedy the injustice that results when a promisee reasonably relies

upon some promise by a promisor, which is then broken, to the promisee's detriment.  Carlson,

918 F.2d at 416.  "Promissory estoppel has been characterized as a substitute for consideration,

an exception to the ordinary contract requirements, or even as a 'species of consideration.'"

Cardamone v. Univ. of Pittsburgh, 384 A.2d 1228, 1233 n.9 (quoting Fried v. Fisher, 196 A. 39,

42 n.5 (1938)).  A broad or vague promise is insufficient to support a claim of promissory

estoppel.  C&K Petroleum Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1998).  Plaintiffs

argue that if the employment and stock buy-out agreements are found not to be valid contracts,

---

[24]   The Court notes that Plaintiffs do not, in their equitable/promissory estoppel claim
seek to have Defendants estopped from denying that Curtis Bair was a party to the shareholders
agreement; rather, the claim only references the employment agreement and the stock buy-out
agreement.  (Doc. No. 4, ¶¶ 119-124.)

the promises made therein should nevertheless be enforced under the theory of promissory estoppel.

Plaintiffs claim that the promises made by Defendants Francis Purcell, Norma Purcell, and Appalachian Baking with respect to Plaintiffs' employment "created the reasonable and justifiable expectation that the Bairs would have a long term employment and business association with [Appalachian Baking] . . . and would not be discharged within a year of relocating to Pennsylvania," and, in light of their 2002 terminations, they seek damages for their detrimental reliance on these representations.  (Doc. No. 4, ¶¶ 121-24.)  However, Pennsylvania law does not recognize a cause of action for promissory estoppel as an exception to the employment-at-will doctrine.  See Paul v. Lankenau Hosp., 569 A.2d 346, 348 (Pa. 1990).  The Pennsylvania Supreme Court reasoned that allowing an employee to rely on equitable doctrines in cases where the law declares that no express or implied contract exists would undercut the at-will employment doctrine.  Id.; see also Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 545 (E.D. Pa. 2004) ("It is firmly established that Pennsylvania courts do not recognize a cause of action for promissory estoppel in the context of at-will employment") (collecting cases).  In the event that a jury concludes that Plaintiffs were not a party to an employment contract, Plaintiffs would be considered at-will employees who could be terminated at any time with or without good cause.  Plaintiffs, therefore, cannot rely on promissory estoppel to enforce the "long-term" employment agreement.

Plaintiffs additionally argue that promissory estoppel should be available to enforce the stock-buy out agreement in the event that a binding contract is found not to exist.  (See Doc. No. 4, ¶ 120.)  In Count I of the amended complaint, Plaintiffs allege that Francis Purcell offered to

purchase Curtis Bair's 15 shares of stock for $203,000 on May 2, 2002, and Curtis Bair accepted

the offer on the same day.  Plaintiffs now allege that notwithstanding this agreement, on July 22,

2002, Francis Purcell promised Curtis Bair again that he would purchase the 15 shares of stock

for $203,000 if the Bairs continued to work at the restaurant.  (Curtis Bair First Supp. Decl. ¶ 37,

Doc. No. 55-4; see also Doc. No. 4, ¶¶ 60-63.)  Plaintiffs argue that they reasonably relied upon

this dishonored promise to buy Curtis Bair's shares and continued to work at the restaurant for a

month until they were terminated on August 16-17, 2002.  (Curtis Bair First Supp. Decl. ¶¶ 37-

39.)  Plaintiffs, however, do not allege any specific injury based upon their reliance.  They have

not introduced evidence indicating that they declined other employment opportunities between

July and August 2002 because of Francis Purcell's statements, or that they did not receive

compensation for their employment during this period.  Plaintiffs have not come forward with

evidence to support their allegation that they changed their position to their detriment because of

their allegedly reasonable reliance on the July 22, 2002, promise.  Based upon the record before

the Court, and the absence of evidence to support this claim, the Court concludes that no

reasonable jury could find that Plaintiffs detrimentally relied upon Francis Purcell's alleged July

20, 2002, promise regarding Plaintiff's employment and Purcell's renewed agreement to

purchase Bair's shares.  Accordingly, Plaintiffs' promissory estoppel claims fail as a matter of

law, and Defendants are entitled to summary judgment on Count VI.

**Count VII: Pennsylvania Wage Repayment and Collection Law**

In Count VII, Patrice Bair alleges that Appalachian Baking, Francis Purcell, Norma

Purcell, and Jessica Kiely violated the Pennsylvania Wage Payment and Collection Law

("WPCL"), 43 Pa. Cons. Stat. § 260.1 et seq., when they failed to timely pay her owed

compensation.  Plaintiffs allege that at the time of Patrice Bair's termination on August 16, 2002,

she was owed $3,420.75 for her work at the corporation.  (Doc. No. 4, ¶ 126.)  Plaintiffs further

allege that Patrice Bair received a partial payment of $1,595.28 in December 2003, and the

remaining balance of $1,825.47 in May 2004.  (Id. ¶¶ 128-29.)  Patrice Bair seeks to recover

liquidated damages, interest from August 2002 to May 2004, and attorney's fees, arguing that

the wage payments were not made in a timely fashion in violation 43 P.S. § 260.3 ("All wages . .

. shall be due and payable within the number of days after the expiration of [the] pay period as

provided in a written contract of employment or, if not so specified, within the standard time

lapse customary in the trade or within 15 days from the end of such pay period.").

     To present a valid claim under the WPCL, a plaintiff must establish "that he was

contractually entitled to compensation and that [defendant] failed to pay the required

compensation."  Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 717 (Pa. Super. Ct.

2005).  The statute applies to "back wages already earned," Allende v. Winter Fruit Distrib's,

Inc. 709 F. Supp. 597, 599 (E.D. Pa. 1989), and includes earnings determined on commission,

Faden v. deVitry, 625 A.2d 1236, 1238 (Pa. Super. Ct. 1993) (citing 43 P.S. § 260.2a).  When

there is a dispute over the amount of wages that an employee is due, "the employer shall

unconditionally pay the amount the employer concedes is due" within the time set by the WPCL,

and an employee can accept this amount without releasing the balance of his claim."  Bandy v.

LG Indus., No. 02-7359, 2003 U.S. Dist. LEXIS 12187, at *18 (E.D. Pa. June 24, 2003) (citing

43 P.S. § 260.6).

     The WPCL provides for liquidated damages when:

          wages remain unpaid for thirty days beyond the regularly scheduled
          payday, or, in the case where no regularly scheduled payday is

applicable, for sixty days beyond the filing by the employee of a proper claim or . . . other act making wages payable . . . and no good faith contest or dispute of any wage claim . . . exists accounting for such non payment . . . .

43 P.S. § 260.10.  The WPCL further provides that an employee shall be entitled to claim "as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater."  Id.  "'Good faith' is not defined in the statute," but it has been determined that "'any contest or dispute that is based on facts that would lead a reasonable person to find a legitimate dispute as to whether wages were due, constitutes good faith.'"  Bandy, 2003 U.S. Dist. LEXIS 12187, at *19 (quoting Keegan v. Fahnestock & Co., Inc., No. 95-5998, 1996 U.S. Dist. LEXIS 13663, 1996 WL 530000, at *12 (E.D. Pa. Sept. 16, 1996)).  Additionally, "an award of attorneys' fees to a prevailing employee in an action brought under the Wage Payment and Collection Law is mandatory," but the Court retains discretion to determine the amount.  Oberneder v. Link Computer Corp., 696 A.2d 148, 151 (Pa. 1997) (determining that the statutory language of "shall" in 43 P.S. § 260.9a(f) mandates such payment).

Defendants argue that their delay in paying Patrice Bair did not violate the WPCL because a good-faith dispute existed over the amount of wages owed to her.  (Doc. No. 33, at 28.)  Defendants allege that Patrice Bair's commission receipts "appeared to contain double, or duplicate, entries" and did not comport with corporate records.  (Id.)  Plaintiffs allege that the documents Patrice Bair submitted to support her wage claim did not include duplicate entries and followed the same procedures as her earlier catering paperwork.  (Doc. No. 55, at 27.)  It appears that a factual dispute exists over whether Defendants had a good-faith defense for failing to timely reimburse Patrice Bair.  Accordingly, summary judgment on this claim is not appropriate.

Defendants also argue that Norma Purcell and Jessica Kiely cannot be held individually liable under the WPCL because Plaintiffs have failed to provide evidence that would demonstrate that they had an active role in the policy-making decisions in Appellation Baking regarding employee compensation.  (Doc. No. 33, at 27.)  "Regardless of whether the corporate veil has been pierced, individuals may be held personally liable" under the WPCL, but only if they fall under its definition of "employer."  Local Union No. 98, Int'l Bhd. of Elec. Workers v. Garney Morris, Inc., No. 03-5272, 2004 U.S. Dist. LEXIS 9528, at *19 (E.D. Pa. May 21, 2004).  This definition includes "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth."  43 P.S. § 260.2a.  The definition has been interpreted as requiring an individual to exercise a policy-making function or responsibility over corporation finances or daily operations.  Garney Morris, 2004 U.S. Dist. LEXIS 9528, at *19 (citing Tyler v. O'Neill, 994 F. Supp. 603, 616 (E.D. Pa. 1998); Mohney v. McClure, 568 A.2d 682 (Pa. Super. Ct. 1990)).  This definition also includes high-ranking individuals who "advise[] on matters of pay or compensation."  International Association of Theatrical Stage Employees, Local Union No. 3 v. Mid-Atlantic Promotions, Inc., 856 A.2d 102, 106 (Pa. Super. Ct. 2004).

Defendants argue that both Norma Purcell and Jessica Kiely "had no active role in the decision-making of the corporation, generally, and specifically as to the payment of wages." (Doc. No. 33, at 27.)  Plaintiffs dispute this characterization of Norma Purcell and Jessica Kiely. Patrice Bair testified by declaration that Norma Purcell, as corporate vice-president, discussed payment of the wages with her and told her that the corporation would not tender the owed

wages until she signed an agreement releasing the corporation from certain liability.  (Patrice

Bair Dep. at 81-82, Doc. No. 55, Ex. 9.)  It is undisputed that Jessica Kiely became store

manager shortly after the Bairs were terminated and was responsible for the restaurant's payroll

during the period that Patrice Bair sought the back-pay.  (Jessica Bair Dep. at 69, Doc. No. 55,

Ex. 11.)  Based upon this evidence, a reasonable jury could find that Defendants Norma Purcell

and Jessica Kiely had policy-making authority or that either woman advised the company on

matters of pay during the time Patrice Bair sought compensation for back wages.  Because a

factual dispute exists regarding the individual Defendants' role in Appalachian Baking's

decision not to fully compensate Patrice Bair until May 2004, summary judgment on this claim

would be inappropriate.  Accordingly, Defendants' motion for summary judgment on Count VII

will be denied.

### Count VIII: Unjust Enrichment

In Count VIII, Plaintiffs allege that Appalachian Baking, Francis Purcell, Norma Purcell,

Jessica Kiely, and Oliver Kiely were unjustly enriched by the experience and "business acumen"

brought to the corporation by Plaintiffs.  (Doc. No. 4, ¶ 134.)  The doctrine of unjust enrichment

is one of equity.  Styler v. Hugo, 619 A.2d 347, 350 (Pa. Super. Ct. 1993), aff'd, 637 A.2d 276

(1994).  A claim of unjust enrichment requires the plaintiff to "show that the party against whom

recovery is sought either wrongfully secured or passively received a benefit that would be

unconscionable for the party to retain without compensating the provider."  Hershey Foods Corp.

v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987).  This determination of

unconscionability does not adhere "simply because the defendant may have benefitted as a result

of the actions of the plaintiff."  Styer, 619 A.2d at 350.  Rather, an unconscionable agreement is

a bargain so unjust that "no man in his senses, not under delusion, would make, on the one hand, and which no honest and fair man would accept on the other[.]"  Hume v. United States, 132 U.S. 406, 411 (1889); see also Doctor's Assoc., Inc. v. Jabush, 89 F.3d 109, 113 (2d Cir. 1996) (quoting Hume); Williston on Contracts § 65:6 (2007) (citing Hume for its "oft-quoted expression of the test [for unconscionability]").  Further, "it has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings."  Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006) (internal citation and quotation omitted).

Plaintiffs base their unjust enrichment claim upon their relocation and their experience in the retail food industry that they brought to the corporation while working at the restaurant. (Doc. No. 4, ¶ 134.)  However, Plaintiffs concede that they were paid a salary during their employment with Appalachian Baking, and Patrice Bair also earned commissions and travel funds above her base pay.  Although Plaintiffs now argue that these agreed upon salaries did not adequately compensate them for the value of their experience, Plaintiffs nevertheless were both paid salaries for the work they performed.  Curtis Bair received a salary of $45,000 a year for his work at the restaurant, and Patrice Bair receive a salary of $20,000 a year plus commissions. (Doc. No. 4, ¶¶ 34, 38.)  Based upon the record, no reasonable jury could find that Defendants were unconscionably enriched by Plaintiffs or their services.  Accordingly, Defendants motion on this point will be granted, and Count VIII will be dismissed.

**Counts IX and X: Aiding and Abetting Breach of Fiduciary Duties**

In Count IX, Plaintiffs allege that Jessica and Oliver Kiely "knowingly participated, encouraged, and/or aided and abetted" Francis and Norma Purcell in breaching their fiduciary duties to the Bairs.  (Doc. No. 4, ¶¶ 138-58.)  In Count X, Plaintiffs allege that Norma Purcell aided and abetted the breach of fiduciary duties by her husband.[25]  (Doc. No. 4, at 43.)

The tort of aiding and abetting requires: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."  Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999) (claim for aiding and abetting under Title VII and New Jersey anti-discrimination law).  "In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."  Bd. of Tr's of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 174 (3d Cir. 2002) (claim for aiding and abetting breach of fiduciary duties under ERISA); see also Restatement (Second) Torts § 876 comment to subsection (b) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

In practice, liability for aiding-abetting often turns on how much encouragement or assistance is substantial enough.  The Restatement

---

[25]  Plaintiffs advance this as an alternative theory in the event that Norma Purcell is not found liable under Count III, but her husband is.  (Doc. No. 55, at 10.)

suggests five factors in making this determination: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind."

Halberstam v. Welch, 705 F.2d 472, 478 (D.C. Cir. 1983) (quoting Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D. Mass. 1981); Restatement (Second) of Torts § 876(b)); see also Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 800 (3d Cir. 1978) (referencing these factors in the context of aiding and abetting securities fraud); Landry v. Fed. Deposit Ins. Corp., 486 F.2d 139, 162 (3d Cir. 1973) (same).  The duration of the assistance provided is often considered as a sixth factor.  Doe v. Liberatore, No. 04-3472, 478 F. Supp. 2d 724, 759 (M.D. Pa. 2007) (citing Hurley, 174 F.3d at 127 n.27)).  Aiding and abetting is a claim distinct from civil conspiracy because aiding and abetting does not require an agreement to participate in tortious conduct, only that the tortfeasor has provided substantial assistance or encouragement to another tortfeasor.  Id.

Defendants argue that Curtis Bair has presented insufficient evidence to survive summary judgment on his claims for aiding and abetting.  In support of this contention, Defendants again state their position that neither Francis nor Norma Purcell violated their fiduciary duties to Curtis Bair.  Assuming that a breach of a fiduciary duty is found, however, Defendants further argue that there is no evidence that the Kielys and Norma Purcell had knowledge of, or encouraged, or assisted such a breach.

The Court agrees that Plaintiffs have failed to introduce evidence to support Count IX, the aiding and abetting claim against Jessica and Oliver Kiely.  Plaintiffs have submitted evidence indicating that Jessica Kiely knew of the business relationship between the Purcells and Curtis Bair and was aware that he was part owner of the restaurant (Curtis Bair Dep. at 221); however, the record does not support a finding that Jessica Kiely provided substantial assistance

or encouragement to the Purcells' alleged breach of fiduciary duties.  Plaintiffs point to three

general pieces of evidence to support their aiding and abetting claim against Jessica Kiely: (1) an

August 2001 disagreement between Jessica Kiely and Curtis Bair during which she stated that

"she would make sure her dad gets rid of [him] just like the prior restaurant manager" (Curtis

Bair First Supp. Decl. ¶ 30); (2) an incident in June 2002 during which Jessica Kiely threatened

to fire Curtis and Patrice Bair (or have her father "get rid of" them) and stated that she would

"run [the Bairs] off" before they would ever own the restaurant (id. ¶¶ 35-35.1); and (3) a

statement Jessica Kiely made during a February 5, 2003, meeting of the Purcells, Kielys, and

Bairs that "Patrice should be paid her catering money and the Stock Buy-Out agreement should

be honored[,] but that she would have to go along with her father Francis Purcell's decision" (id.

¶ 42); (but see Pl. Ex. 14, at 2, Jessica Kiely denies Plaintiffs' request for admission "in so far as

it refers to any statements concerning the stock buy-out agreement").  (Doc. No. 55, at 12.)

        The August 2001 disagreement precedes the course of conduct forming the basis for

Curtis Bair's claim for breach of fiduciary duties.  Because the Purcells' allegedly tortious

conduct had not yet occurred, this cannot serve as evidence of aiding and abetting the same.

Nothing in the record indicates that Jessica Kiely's June 2002 threats were ever communicated to

her parents, the Purcells; thus, they cannot be considered evidence that she encouraged or

otherwise assisted them to act in a manner inconsistent with their fiduciary obligations to Curtis

Bair.  Finally, the comments made by Jessica Kiely during the February 5, 2003, meeting of the

Purcells, Kielys, and Bairs suggests that she did not offer encouragement or assistance to her

parents' conduct.  According to Curtis Bair, although Jessica Kiely stated she would accept

whatever decision her father made, she did express her opinion that the Bairs were entitled to

receive the outstanding wages for Patrice Bair's catering work and to be bought out in accordance with the buy-out agreement.  (Curtis Bair First Supp. Decl. ¶ 42.)  While the record supports a finding that Jessica Kiely and the Bairs did not always have an amicable working relationship, it does not support a finding that Jessica Kiely "knew that the [Purcells'] conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to [them] in committing that breach."  <u>Bd. of Tr's of Teamsters Local 863 Pension Fund v. Foodtown, Inc.</u>, 296 F.3d 164, 174 (3d Cir. 2002).

There is scant evidence in the record relating to Oliver Kiely, who became the Purcells' son-in-law in September 2001.  In fact, it seems that he had very little to do with the restaurant until October 2003, when he began working for Appalachian Baking as the store's co-manager with his wife Jessica Kiely.  (Doc. No. 36, ¶ 25.)  Then on December 12, 2003, Francis Purcell and Jessica Kiely nominated him to serve as vice president of Appalachian Baking.  (<u>Id.</u> ¶ 26.)

To support the aiding and abetting claim against Oliver Kiely, Curtis Bair points to the February 5, 2003, meeting mentioned above, during which Oliver Kiely "repeatedly made comments to Francis and Norma Purcell, encouraging and challenging them not to pay Patrice and me anything because he claimed they did not ow[e] Patrice and me anything.  Further, Oliver asked what is the worst that can happen to them if they did not honor the agreement with Patrice and me."  (Curtis Bair First Supp. Decl. ¶ 42.)  Oliver Kiely admits to making statements to the effect that the Bairs were not owed money by the Purcells or Appalachian Baking, generally or with respect to the shares of stock, but explains that these comments must be taken in context of the social nature in which they were made – "the gathering took place at an Appleby's [sic] restaurant and at the Knights of Columbus."  (Pl. Ex. 12, Doc. 55-13, Oliver

Kiely request for admissions.)

These February 5, 2003, statements suggest that Oliver Kiely generally understood the business relationship between the Purcells and the Bairs, knew the Bairs were no longer working at the restaurant, and was aware of the disputed buy-out agreement and wage requests. However, when considered in context and in relation to the allegedly tortious acts of the Purcells,

these isolated comments do not amount to the degree of encouragement or assistance necessary to support a claim for aiding and abetting.  To this day, Francis Purcell disputes the existence of the alleged stock buy-out agreement, and the Purcells refused to unconditionally tender Patrice Bair's wages until May 2004.  A fact-finder could not reasonably conclude that the comments made to the Purcells by their son-in-law during a social gathering were a substantial factor in causing their alleged breach of fiduciary duties.  Accordingly, Defendants Jessica and Oliver Kiely are entitled to summary judgment on Count IX.

Plaintiffs advance Count X as an alternative claim – in the event that Norma Purcell is not found liable for breaching the fiduciary duties she owes to Curtis Bair as a minority shareholder, Plaintiffs urge that there is sufficient evidence from which a fact-finder could reasonably conclude that she provided encouragement and substantial assistance to her husband's breach of his fiduciary duties.  The record clearly shows that Norma Purcell was aware of the business relationship between her, her husband, and Curtis Bair, and that Bair was a minority shareholder of Appalachian Baking.  Norma Purcell was also aware of, and concerned about, the deteriorating relationship between her, her husband, and the Bairs.  (Norma Purcell Dep. at 15-20, Def. Ex. H, Doc. No. 32-2; see also Doc. No. 55, at 6-7.)  Additionally, she

47

received repeated requests from the Bairs relating to, <u>inter alia</u>, the stock buy-out agreement and

the Bair's concerns about employment and Patrice Bair's unpaid wages.  (Francis Purcell Dep. at

63-64; Norma Purcell Dep. at 103-04, 124, 108; Patrice Bair Dep. 68, 77.)  Thus, Norma Purcell

was aware of their business arrangement and the overall status of the disputes between her

husband and the Bairs.  The parties dispute, however, whether Norma Purcell provided

substantial encouragement or assistance to her husband's alleged breach of his fiduciary duties

such that liability for aiding and abetting would attach.  Because of the disputed facts material to

the determination of the extent of Norma Purcell's involvement in, assistance of, and

encouragement of her husband's allegedly tortious actions, summary judgment on this claim is

inappropriate.

Defendants have produced evidence indicating that Norma Purcell was a supportive wife

and home-maker who was uninvolved with the day-to-day operations of the Appalachian Baking

and the restaurant.  They imply that Norma's alleged encouragement of her husband stemmed

from their marital relationship and her desire to be a supportive spouse, not from an

understanding of her role in Francis Purcell's alleged breach of fiduciary duties.

While claiming on one hand to be removed from Appalachian Baking and the restaurant,

Norma Purcell also explains, however, that she was aware of and involved in any major issue

with the company.  (<u>See, e.g.</u>, Norma Purcell Dep. at 51) ("If there was a major issue involved in

the company, I was involved in it"); (<u>see also id.</u> at 108) (generally acknowledging her

involvement in the decision to eliminate Patrice Bair's position).  Norma Purcell testified at her

deposition that her husband consulted with her before making decisions that would affect the

company.  (<u>See</u> Norma Purcell Dep. at 124) ("I had backed up my husband – that that's [sic]

why, you know, he went into the business, because, you know, of course he wants my opinion whether he should start something so big or go into retirement.  He would consult with me.  And so, yes, I encouraged him to do what I felt he wanted to do.").  Patrice Bair testified that Norma Purcell presented herself as her husband's equal in the business.  (See Patrice Bair Dep. at 52) ("Norma has always told me that she was abreast of everything, every situation.  She was very knowledgeable in each business.").  When asked if she "consider[ed] Corky and Norma to be business equals in the running of the business,"  Patrice Bair responded: "Business equals, business equals in decision-making definitely . . . Operationally, Norma always expressed a great understanding of operations."  (Id. at 53.)  Norma Purcell's involvement in various meetings between herself, her husband, and the Bairs also undercuts her argument that she was only minimally involved in or aware of her husband's business decisions.[26]  For instance, Norma Purcell was present during a July 22, 2002, meeting with her husband and the Bairs during which both she and her husband Purcell assured the Bairs that they would complete the buy-out agreement by the end of the year.  (Curtis Bair First Supp. Decl. ¶ 37.)  Plaintiffs have introduced evidence that Norma Purcell later expressed support for the decision not to fulfill the alleged buyout agreement.  For example, in October 2003, when discussing a potential settlement and release of the Bairs' claims she stated, that "since Patrice and [Curtis] would not agree with any new settlement demands, then we would get nothing and that we could do

---

[26]  Norma Purcell also met with Patrice Bair regarding signing a release of liability (Norma Purcell Dep. at 103-04), and she admits being approached by parties to the suit relating to the deteriorating situation at the restaurant.  (Id. at 144) ("I was tired of being pressured to try to persuade my husband to go their [the Bairs'] way when I didn't think that he needed to at this point."); (id. at 124) ("I had backed up my husband . . .  And so here we were in one big fat mess that I wasn't able to resolve after getting everybody approaching me, you know, for different matters.").

nothing about it. . . [W]hat are you going to do, go and get an attorney?  What is that going to

do?  Corky is confident that you will get nothing."  (Id. ¶ 44.)  In sum, there is evidence on the

record that could support a finding that Norma Purcell aided and abetted her husband's tortious

activities.

Given the genuine disputes over the extent to which Norma Purcell assisted and/or

encouraged her husband's alleged breach of fiduciary duties, Defendants are not entitled to

summary judgment on Count X.  Should Curtis Bair prevail on Count III against Francis Purcell,

a reasonable fact finder could conclude that Norma Purcell was aware of her husband's improper

conduct and that she substantially supported him and encouraged him in his various decisions

related to Appalachian Baking and the Bairs.

### Count XI: Civil Conspiracy

In their motion for summary judgment on this count, Defendants contend that the

amended complaint fails to state a claim of civil conspiracy since it is "devoid of the specific

factual averments required to support such a cause of action."  (Doc. No. 33, at 33.)

Furthermore, Defendants argue that Plaintiffs have not presented sufficient evidence to support

the claim and that, as a result of this failure, Defendants are entitled to summary judgment.

Proof of a civil conspiracy requires a plaintiff to show that two or more persons

"combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by

unlawful means."  Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).  To

prevail on a cause of action for civil conspiracy under Pennsylvania law, Plaintiffs must prove

the following elements: (1) a combination or agreement of two or more persons acting with a

common purpose to do an unlawful act or to do a lawful act by unlawful means or for an

unlawful purpose; (2) an overt act done in pursuit of the common purpose; and (3) actual legal damage. Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (citing Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)); see also Thompson Coal, 412 A.2d at 472. While conspiracy can, and most often is, proven by circumstantial evidence, a plaintiff's suspicion of a "guilty connection[] is not to be received as proof in such a case. . . ." See Thompson Coal, 412 A.2d at 473 n.9 (quoting Benford v. Sanner, 40 Pa. 9, 15 (1861)).

To adequately plead a civil conspiracy claim, a plaintiff must allege particularized facts, "such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose . . . ." Kalamanovitz v. Heileman Brewing Co., 595 F. Supp. 1385, 1401 (D. Del. 1984), aff'd 769 F.2d 152 (3d Cir. 1985); see Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1959 (2007) ("[A] formulaic recitation of a cause of action's elements will not do."); Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (explaining, in the context of a RICO claim, that under Rule 8 "allegations must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy'") (citation omitted); see also Crane v. Cumberland County, No. 99-1798, 2000 U.S. Dist. LEXIS 22489, at *30-31 (M.D. Pa. June 16, 2000) (citing Ryan v. Mary Immaculate Queen Ctr., 188 F.3d 857, 860 (7th Cir. 1999)) (noting that a plaintiff must bring more than "a bare allegation of conspiracy," and instead must make "some minimum description of the defendant's complained-of conduct," the conspiracy's formation, and its scope).

Count XI of Plaintiffs' amended complaint contains general statements that Defendants

51

"acted with a common purpose to do an unlawful act or a lawful act by unlawful means of for an

unlawful purpose," "participated in and encouraged various overt acts done on pursuance of the

common purpose," that they acted with malice, and that Plaintiffs suffered injury as a result.

(Doc. No. 4, ¶¶ 160-163.)  These are not the "particularized" factual allegations required to be

pleaded under existing case law.  Notably, Plaintiffs do not identify any common purpose

purportedly shared by all four Defendants, nor do Plaintiffs identify the relevant time frame of

the conspiracy or when each Defendant allegedly joined the conspiracy.  Additionally, the

amended complaint addresses conduct spanning over several years – from 1998 until 2004 (id.

¶¶ 23, 71, 77, 130) – yet the amended complaint fails to identify, in any meaningful manner,

when the alleged conspiracy was formed and how long it continued.

     Nevertheless, Plaintiffs argue that their amended complaint sufficiently pleads a

conspiracy claim "aris[ing] out of the same conspiratorial scenario where false

misrepresentations are made to the Plaintiffs who rely on those misrepresentations to their

detriment, followed by specific acts oppressing the Plaintiffs as minority shareholders."  (Doc.

Nos. 19, at 16; 55, at 35).  While the amended complaint does contain numerous allegations of

misconduct by the various Defendants,[27] it does not contain an allegation that these four

_____

[27]  In their brief in opposition to Defendants motion for judgment on the pleadings,
Plaintiffs argued:

> Defendants apparently ignore that the Plaintiffs incorporated the 158
> paragraphs preceding the conspiracy count and want Plaintiffs to
> specifically re-allege all of the overt acts and all of the objects of the
> conspiracy.  This would be a useless and wasteful task, and
> incorporation paragraphs such as Paragraph 159 of the Amended
> Complaint are a well accepted vehicle to meet the minimum notice
> pleading requirements in federal court.

Defendants agreed to conduct themselves in a coordinated manner to cause Plaintiffs' harm. After considering the allegations contained in Count XI and the preceding sections of the complaint, the Court finds that Plaintiffs have failed to adequately state a claim for civil conspiracy.

Assuming arguendo that Plaintiffs' general allegations were sufficient to place Defendants on notice of their allegedly unlawful conduct, Plaintiffs' civil conspiracy claim still fails because they have not pointed to evidence that would allow a fact-finder to conclude that an agreement existed between the four Defendants.[28]  In their brief in opposition, Plaintiffs state, without reference to the record, that they have presented sufficient evidence to get to a jury:

> Plaintiffs have set forth sufficient evidence to show that these four individuals . . . acted together to commit wrongful acts, that overt acts were committed by them and, as a result, Plaintiffs suffered damages.

---

(Doc. No. 19, at 16.)  The Court has considered the numerous allegations made in the paragraphs preceding Count XI.  These paragraphs primarily detail the wrongs independently committed by the various Defendants.  For example, the amended complaint details: (1) statements purportedly made by Francis Purcell and Normal Purcell to induce Plaintiffs to participate in their latest business venture, Appalachian Baking (E.g., Doc. No. 4, ¶¶ 24-28); (2) representations made by Francis Purcell regarding the purchase of Curtis Bair's stock (e.g., id. ¶¶ 50-52); (3) unprofessional conduct by Jessica Kiely and threats she purportedly made to "run [Plaintiffs] out of the company" (id. ¶¶ 23-44, 140-141); (4) favoritism the Purcells exhibited toward their daughter (e.g., id. ¶¶ 44, 49); (5) Francis Purcell's termination of Plaintiffs with the consent and knowledge of Norma Purcell (id. ¶¶ 64-66); etc.

[28]  Because the duration of, and the specific conduct included in, the alleged conspiracy is unclear, the Court cannot determine whether, and to what extent, the "intracorporate conspiracy doctrine" would apply to the claim.  Under the "intracorporate conspiracy doctrine," unless an agent is acting outside the scope of his agency in a personal capacity for his sole personal benefit, "an entity cannot conspire with one who acts as its agent."  Gen. Refractories, 337 F.3d at 313 (citing Heffernan v. Hunter, 189 F.3d 405, 412-13 (3d Cir. 1999)).  Additionally, "where employees or agents for the corporation act within the scope of their employment or agency, the employees, the agents and the corporation are one and the same; there is no third party." Rutherford v. Presbyterian-Univ. Hosp., 612 A.2d 500, 508 (Pa. Super. Ct. 1992) (noting that agents of a single entity cannot conspire with themselves).

As noted above, Francis and Norma Purcell and Oliver and Jessica
Kiely took affirmative steps to drive the Bairs from the Company.

(Doc. No. 55, 35).  In their response/statement of material facts to Defendants' motion for

summary judgment (Doc. No. 56), Plaintiffs argue that the following conduct supports their civil

conspiracy claim: (1) the conduct cited by Plaintiffs in support of Curtis Bair's breach of

fiduciary duties claim against the Purcells (general self-dealing, oppressive conduct, unfair

treatment, usurpation of corporate opportunities, etc.); (2) the verbal altercations between Curtis

Bair and Jessica Kiely about her unprofessional conduct and her statements about "running the

Bairs out" of the company; and (3) Oliver Kiely's statement that, in his opinion, the Bairs were

"owed nothing" for Curtis Bair's fifteen shares of stock.  (Id. ¶¶ 92-94, incorporating by

reference id. ¶¶ 47, 51, 55, 58, 64, and Doc. No. 36, Pl. SMF in support of motion for partial

summary judgment).  Again, while Plaintiffs have proffered evidence of the allegedly wrongful

conduct by the various Defendants, they have not pointed to evidence demonstrating that all four

Defendants named in this count entered into an agreement with one another to do an unlawful act

or to do an otherwise lawful act by unlawful means.  Accordingly, Defendants are entitled to

summary judgment on Plaintiffs' civil conspiracy claim.

**Count XII: Punitive Damages**

In Count XII, Plaintiffs allege a general claim against all Defendants for punitive

damages.  (Doc. No. 4, ¶¶ 164-65.)  Defendants correctly explain that punitive damages may not

be pleaded as a separate cause of action under Pennsylvania law, but are merely a type of

damage incident to an underlying cause of action.  Underwood v. Beaver Cty. Children & Youth

Servs., No. 03-1475, 2005 U.S. Dist. LEXIS 23012, at *10 (W.D. Pa. Oct. 7, 2005); Winterberg

v. CNA Ins. Co., 868 F. Supp. 713, 725 n.20 (E.D. Pa. 1994); Nix v. Temple Univ., 596 A.2d

54

1132, 1138 (Pa. Super. Ct. 1991).  The Court notes that Plaintiffs have already incorporated a request for punitive damages into each count of their Amended Complaint other than Count VII. Therefore, the Court will grant Defendants' motion to dismiss Count XII of Plaintiffs' Amended Complaint for a separate claim for punitive damages.

## IV.    CONCLUSION

In conclusion, after a consideration of the record and the arguments advanced by the parties, the Court finds that Norma Purcell is entitled to summary judgment on Count I (breach of the stock buy-out agreement) and Count II (breach of employment contract/additional consideration).  With respect to Count III (breach of fiduciary duties) and Count X (Norma Purcell's aiding and abetting of her husband's breach of fiduciary duties) summary judgment will be entered with respect to the claims asserted by Patrice Bair.  Furthermore, Defendants are entitled to summary judgment on the following claims: Count IV ( negligent misrepresentation); Count V (intentional misrepresentation); Count VI (equitable/promissory estoppel); Count VIII (unjust enrichment); Count IX (aiding and abetting against the Kielys); Count XI (civil conspiracy); and Count XII (punitive damages).

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS BAIR, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 1:04-CV-1357** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANCIS X.I. PURCELL, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, this 2nd day of August, 2007, **IT IS HEREBY ORDERED** that Plaintiffs'

Motion for Partial Summary Judgment (Doc. No. 34) is **DENIED,** and Defendants' Motion for

Summary Judgment (Doc. No. 32) is **GRANTED IN PART** as follows:

1.  Summary judgment is **GRANTED** in favor of Norma Purcell on Count I (breach
    of buy-out agreement) and Count II (breach of employment contract/additional
    consideration).

2.  Summary judgment on Count III (breach of fiduciary duties) and Count X (aiding
    and abetting a breach of fiduciary duties against Norma Purcell) is **GRANTED** in
    Defendants' favor with respect to the claims asserted by Plaintiff Patrice Bair.

3.  Summary judgment is **GRANTED** in favor of Defendants on Counts IV and V
    (negligent and intentional misrepresentation); Count VI (equitable/promissory
    estoppel); Count VIII (unjust enrichment); Count IX (aiding and abetting a breach
    of fiduciary duty against Jessica and Oliver Kiely); Count XI (civil conspiracy);
    and Count XII (punitive damages).

In all other respects, Defendants' motion for summary judgment is **DENIED**.

Defendants' motion for judgment on the pleadings (Doc. No. 15) and Plaintiffs' motions

to strike certain exhibits offered by Defendants in support of their motion for summary judgment (Doc. Nos. 57, 69) are **DENIED AS MOOT**.  The Court notes that it did not utilize the contested exhibits in adjudicating Defendants' motion for summary judgment.

   **IT IS FURTHER ORDERED** that the stay in this case is **LIFTED**.  A telephone conference shall be held on August 16, 2007, at 11:00 a.m., at which time a new trial schedule and briefing deadlines for motions in limine will be discussed.[29]  The call shall be initiated by Plaintiff's counsel.  The telephone number of the Court is 717-221-3990.

   S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

---

   [29]  The parties need not brief the already filed motions in limine before the telephone conference is held.  (Doc. Nos. 70, 72, 74, 76, 79.)  The schedule that is set during that conference will apply to these motions as well as any additional motions in limine to be filed by the parties.