**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS BAIR, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 1:04-CV-1357** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANCIS PURCELL, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court are the parties proposed findings of fact and conclusions of law on

Plaintiff Curtis Bair's breach of fiduciary duty/shareholder oppression claim (Doc. Nos. 163,

165), objections to these proposed findings (Doc. Nos. 168, 170), and the jury's advisory

findings and verdict (Doc. No. 158).  The Court heard testimony on this matter at the trial that

occurred in February 2008, the proposed findings are fully briefed, and the matter is ripe for

disposition.  For the reasons that follow, the Court will render a verdict in favor of Plaintiff

Curtis Bair on his breach of fiduciary duty/shareholder oppression claim.  Also before the Court

is Plaintiffs' motion for attorney fees and costs.  (Doc No. 161.)  Because the Plaintiffs' fee

petition is not currently sufficient for the Court to exercise its discretion in assessing the motion,

the Court will reserve ruling on the motion until Plaintiffs have an opportunity to supplement

their petition.

**I.      BACKGROUND**

   **A.  Procedural Background**

After a nine day trial in the above-captioned matter in February 2008, the jury returned a

verdict in favor of Plaintiffs on three claims.  (Doc. No. 158.)[1]  Before trial, the Court determined

that Curtis Bair's fiduciary duty claim was equitable in nature and determined it was properly for

the Court to render a verdict on the claim.  To assist the Court in crafting an equitable verdict,

the issue was submitted to the jury, which has made advisory factual findings and rendered an

advisory verdict in favor of the Plaintiffs on this claim.  (Doc. No. 158 at 7-17.)

### B.  Findings of Fact

Based on the testimony and evidence put forward by the parties at trial and pursuant to

Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of

fact by a preponderance of the evidence:

1. In 1998, Defendant Francis Purcell incorporated the Appalachian Baking Company ("Appalachian Baking") in Pennsylvania as a closely held business corporation with offices in Harrisburg, Pennsylvania and entered into a ten year franchise agreement with Atlanta Bread Company International, Inc. pursuant to which Appalachian Baking was granted exclusive development rights for Atlanta Bread Company stores in Dauphin, Cumberland and Lebanon Counties; the State College area; and the Baltimore, Maryland area.

2. Prior to their involvement with Appalachian Baking, Plaintiffs Curtis Bair and Patrice Bair (husband and wife) lived and worked in Atlanta, Georgia.  Curtis Bair and Patrice Bair have known Francis Purcell and his wife Norma Purcell for a number of years and had previously worked with them in an Atlanta, Georgia franchise operation known as Peachtree Pretzel Time Inc., ("Peachtree").  As of May 1998, Curtis Bair held a ten percent ownership interest in the Peachtree franchise and both he and his wife worked in the franchise operation.

3. During a meeting in May of 1998, Francis and Norma Purcell, Curtis and Patrice Bair and Deborah and Jay James began discussing franchise opportunities with a franchise known as the Atlanta Bread Company.  Later in 1998, Francis Purcell informed Curtis and Patrice Bair that he had decided to pursue an Atlanta Bread Company franchise.

---

[1]  The Court has instructed the Clerk of Court to defer entering judgment on the Plaintiffs' claims for breach of stock buy-out agreement, breach of employment contract, and violation of Pennsylvania's Wage Payment and Collection Law pending adjudication of the breach of fiduciary duty/shareholder oppression claim.  (Doc. No. 160 ¶ 4.)

4.     During the course of this meeting and subsequent meetings, Francis and Norma Purcell made promises and projections to Curtis Bair and Patrice Bair to the effect that Curtis and Patrice Bair would have a long-term role with the new company; that Curtis Bair's salary would start at $55,000 and would increase to $100,000 after the company's third Atlanta Bread Company store opened; that after five years, Francis Purcell would retire and Curtis Bair would step into his position in the company.

5.     In June 2000, Francis Purcell sent Curtis Bair a packet of documents to be circulated to potential investors in Appalachian Baking.  The packet included an offering and subscription memorandum, a confidential descriptive memorandum, a form subscription agreement, a form shareholder joinder, and a form shareholders agreement.  The confidential descriptive memorandum stated that the company planned to operate one or more retail bakery and café restaurants under the name "Atlanta Bread Company" within the exclusive development territory described above.

6.     The form shareholder agreement was dated June 1, 2000, and listed Curtis Bair as one of the original shareholders in the company and as a member of the board of directors.

7.     Francis Purcell instructed Curtis Bair to sign ten copies of the last page of the shareholder agreement as secretary of the corporation and forward those copies to Francis Purcell.  Curtis Bair followed these instructions.  Curtis Bair was told by Francis Purcell and believed that from that point forward he was a party to the shareholders agreement sent out with the offering package.

8.     Section 2.02 of the June 1, 2000, shareholders agreement specifically indicates that Curtis Bair would be a member of the Board of Directors of the corporation. Section 2.02 further provides that in the event Curtis Bair ceases to be a shareholder, Francis Purcell may designate another shareholder to be a director. The shareholders agreement contains a certificate of value dated May 10, 2000, establishing a value of $17,000 per share which is the price to be used to purchase a shareholder's shares upon the death, withdrawal from the enterprise or disability of a shareholder under the shareholders agreement.

9.     The offering information packet was sent to other potential investors, including Robert and Lori Green and Jay and Deborah James.  This information packet contained, among other things, a confidential descriptive memorandum, which provides that the estimated gross profits from restaurant sales of $1 million would be $190,000 per year.  The confidential descriptive memorandum also provided that the estimated gross profits was not a financial projection or a statement of profitability.  The provided estimate comported with Curtis Bair's prior

experience in the food service industry and also the average business of an Atlanta Bread Company store at that point in time.

10.     Robert and Lori Green and Jay and Deborah James executed the shareholder joinder to the Appalachian Baking Company and shareholders agreement indicating that "as of the date written below, shareholder shall become a party as a shareholder to the company shareholders agreement effective June 1, 2000 or any amendment thereto.  Shareholder agrees to be bound by all the terms and provisions of the shareholders agreement, or any amendment thereto, as though he or she was an original party thereto and was included in the definition of "shareholder" as used therein."

11.     Robert and Lori Green executed the above-quoted shareholder joinder subscribing to six shares for $100,000 on June 20, 2000, and Deborah and Jay James executed the above-quoted shareholder joinder subscribing to two shares for $40,000 on July 28, 2000.

12.     On June 7, 2000, Appalachian Baking Company entered into a ten year lease for a restaurant located in Harrisburg, Pennsylvania at a location known as the Paxton Towne Center.

13.     On February 5, 2001, Appalachian Baking Company issued shares of stock to Robert and Lori Green and Jay and Deborah James.  On the same date, Norma Purcell also became the co-owner of Francis Purcell's majority shareholdings in Appalachian Baking Company, Inc.

14.     On October 30, 2000, a stock purchase agreement for the outstanding capital stock of Peachtree Pretzel Time, Inc. was entered into with Mrs. Fields Holding Company, Inc.  The agreement included a covenant not to compete barring shareholders in Peachtree, including Curtis Bair, from owning, managing, operating, or controlling, or participating in the ownership, management, operation or control of, or being connected with, or having any interest in as a stockholder, director, officer, employee, agent, consultant, assistant, advisor, sole proprietor, partner or otherwise, in any shipping mall based food business or retail baked goods business other than Appalachian Baking Company.

15.     Francis Purcell negotiated the stock purchase agreement with Mrs. Fields on behalf of all shareholders of Peachtree Pretzel Time.  After the sale, Curtis Bair informed Francis Purcell about a good opportunity to open a sports bar in a mall in Atlanta.  Francis Purcell warned Curtis Bair that this may be prohibited by the non-compete agreement he had signed.

16.     After the stock purchase agreement was entered into, Curtis Bair and his wife Patrice Bair, agreed to Francis Purcell's request to become employees of Mrs.

Fields to monitor the business and be in place to keep running the company to minimize transition losses in case Mrs. Fields defaulted on their payments under the stock purchase agreement. Curtis Bair took a reduction in salary from over $100,000 per year to $70,000 per year when he went to work for Mrs. Fields.

17. On February 5, 2001, a consent of shareholders and directors in lieu of a special meeting was entered on the corporate books by Francis Purcell in which Certificate N. 1 issued to Francis Purcell for 100 shares of Appalachian Baking Company, Inc. was marked void and a new certificate was issued to Francis and Norma Purcell for 77 shares, Robert L. Green and Lori Dunn Green for six shares and Jay James and Deborah James for two shares.

18. Investors in Appalachian Baking Company had an expectation that a full $500,000 would be raised for initial operation of the company. After the investment of the Greens and Jameses, there was still a $360,000 shortfall in this initial operational capital from unsold shares. The initial offering to investors had a provision that any unsold shares would be purchased by Francis Purcell. Instead, Francis and Norma Purcell loaned Appalachian Baking up to $238,000 rather than making a capital investment in the company by purchasing shares. In 2003, the Purcells received $119,000 back on the loan. The loaned money was paid back to the Purcells from the company without attending to any of the formalities of a dividend and not allowing other shareholders to participate.

19. In early July 2001, an emergency developed when John Krulock, the manager of the newly opened Appalachian Baking Company restaurant at Paxton Towne Center, sought to quit his position and leave employment of the company because of extremely demanding hours and conflicts with Jessica Purcell, an employee under his supervision who was also the daughter of Francis and Norma Purcell.

20. Francis Purcell contacted Curtis Bair and requested him to immediately resign his position at Mrs. Fields, put his house in Atlanta up for sale and relocate to the Harrisburg area to take over the management of the first store. Curtis Bair agreed to do all this and on July 12, 2001, submitted his letter of resignation to the Mrs. Fields organization.

21. The Bair residence in Atlanta, Georgia was put on the market by Patrice Bair who stayed to sell the residence and execute the move. Francis Purcell requested that Bair put the residence on the market at a lower price so that it would sell within 30 to 60 days and it actually sold within 20 days.

22. When Curtis Bair came to Harrisburg and began managing the restaurant at the Paxton Towne Center, the store was doing a high volume of business. At this time, Curtis Bair took another cut in pay to $45,000. He was also issued 15 shares of Appalachian Baking Company stock on August 8, 2001. Text on these

stock certificates provided that the certificates may not be sold, assigned, transferred, pledged or otherwise disposed of except in accordance with the terms and conditions of the bylaws of the corporation.

23.     On August 14, 2001, Francis Purcell wrote to Michael Ward, counsel for Mrs. Fields Holding Company, Inc. requesting approval for Appalachian Baking Company, Inc. to employ Patrice Bair.  This was necessary in order for Francis Purcell to be relieved of his obligation under the stock purchase agreement not to hire former employees of Pretzel Time, Inc.

24.     On September 22, 2001, Jessica Purcell married Oliver Kiely and changed her name to Jessica Kiely.

25.     Between July 2001 and April 2002, significant efforts were made to locate new sites for additional Atlanta Bread Company restaurants within the exclusive sales territory of Appalachian Baking Company.  Store sites were located in York and Camp Hill with projected opening dates for those locations in the later part of 2002.

26.     Despite progress on the additional locations, on April 9, 2002, Francis Purcell informed Curtis Bair that he decided not to open up any more locations because he wanted to retire.  Francis Purcell presented a handwritten outline of four different options that were available to Curtis Bair: (1) open another store in the territory, borrow $500,000 at 8.5% for 5 years with payments of $10,258 per month, pay Francis Purcell consulting fees of $300 weekly until the loan is satisfied, pay $105,000 to buyout Robert and Lori Green and Jay and Deborah James; (2) buy a Pretzel Time type cookie store for up to $150,000; (3) take a $100,000 buyout of his stock; or (4) buy the existing store for $750,000 plus $210,000 to Robert and Lori Green and Jay and Deborah James.  Francis Purcell indicated that the Bairs should take this list of options with them on vacation and discuss it.

27.     On or about May 2, 2002, Francis Purcell and Curtis Bair met at the restaurant and Curtis Bair presented documents reviewing these various offers to Francis Purcell.  Curtis Bair reviewed the four options showing why they were not to his economic advantage and indicated that what he wanted to do was to have the company buy back his stock for $250,000.  Francis Purcell suggested that the corporation instead buy Curtis Bair's stock back for $203,000 and Curtis Bair agreed.

28.     Shortly after May 10, 2002, Curtis Bair asked Francis Purcell whether he had told the other shareholders what he was doing with the business.  Francis Purcell indicated he had sent them a memorandum.  Curtis Bair asked for a copy and was provided with a copy of a memorandum sent to Robert and Lori Green and Jay

and Deborah James on May 10, 2002, to which Francis Purcell had added, in his own handwriting, an option to sell back their stock for $203,000 and had also added writing concerning a plan to sell his stock in the company to Jessica Kiely for $200,000.  In a handwritten note only on the May 10, 2002, memorandum to Curtis Bair, Francis Purcell also indicated that this plan also involved a consulting fee and hospitalization plan for Francis Purcell for approximately 17 years.

29.   Francis Purcell offered to sell the store to Jessica Kiely on terms more favorable than those that he offered to Curtis Bair.

30.   At one point in the latter part of May 2002, Francis Purcell called Bair to his house to discuss the potential sale of the company to Jessica Kiely.  Francis Purcell disclosed that he and Norma Purcell were concerned about whether Jessica Kiely could handle the store by herself.  He asked Curtis Bair to consider purchasing the restaurant instead of selling back his stock for the agreed $203,000.  Curtis Bair indicated that he would need more information about the company's worth and the structure of the contract before making his decision.

31.   Curtis Bair reviewed the proposition and prepared a written critique comparing the various offers made by Francis Purcell to Curtis Bair and other shareholders. Curtis Bair met with Francis Purcell and showed him the comparison, indicating that purchasing the restaurant was not economical and/or feasible, especially considering the 17 year consulting fee and health insurance plan for Francis Purcell in the agreement.

32.   On June 24, 2002, Curtis Bair wrote "I Curtis L. Bair elect to sell my stock under Option A: sell my stock for 203,000" and signed it and faxed it to Francis Purcell.

33.   During the period leading up to Curtis Bair's election to sell his stock back to the company, Jessica Kiely and Curtis Bair had several disagreements about operation of the restaurant, at one point culminating in a loud verbal confrontation in the presence of customers.  Jessica Kiely also had threatened to run Curtis Bair and Patrice Bair out of the company.

34.   On July 3, 2002, a meeting occurred between Francis Purcell, Curtis Bair, and Patrice Bair on the patio at the Atlanta Bread Company store.  Francis Purcell indicated that the buyout for $203,000 is no longer available and that the Bairs would have to stay on to manage the store until an outside investor purchased the company.  During the argument that ensued, Francis Purcell threatened that Bair's 15 shares would be worthless if he left the company to pursue other options or if he got an attorney involved because he would see to it that the company never paid out a dividend.  He specifically threatened to destroy the Bairs.

35.    Shortly after this July 3 confrontation, Curtis Bair went to Attorney Sacks, the
       Appalachian Baking corporate attorney.  Sacks had a long time business and
       social relationship with Francis Purcell.  Curtis Bair asked Sacks for a copy of the
       shareholders agreement.  Sacks told Curtis Bair that he would have to get
       clearance from Francis Purcell before giving him a copy.

36.    Shortly after the July 3 confrontation, Francis Purcell gave Curtis Bair a notice of
       Combined Special meeting of the Board of Directors and Shareholders to be held
       July 20, 2002, in accordance with the bylaws.  Curtis Bair asked at that time for a
       copy of the bylaws.  Francis Purcell gave Curtis Bair a two page document that
       was not the corporate bylaws, but only a two page "Key to Bylaw Inserts."

37.    Corporate records were withheld from Curtis Bair by Francis Purcell.

38.    On July 9, 2002, a shareholders agreement was mailed to Curtis Bair by Attorney
       Sacks.  The shareholders agreement mailed was materially different from the
       original June 2000 shareholders agreement.  The new shareholders agreement has
       a date line at the top of it indicating that it was prepared on September 21, 2001,
       and the original parties to the agreement are not Curtis Bair and Francis Purcell
       but Francis Purcell and Norma Jean Purcell.  Jessica Kiely also witnessed
       signatures and signed the new agreement.  The certificate of value attached to the
       agreement shows that Francis Purcell and Norma Purcell own only 77 shares – a
       circumstance that did not exist until February 5, 2001, when Francis Purcell's
       original 100 share certificate was canceled.  These circumstances indicate that this
       document was prepared long after the Greens and Jameses had signed on to the
       original Bair/Purcell shareholder agreement in June and July 2000.

39.    Curtis Bair was a party to the original Appalachian Baking Company
       shareholders agreement and Francis Purcell made material alterations to the
       agreement by substituting his wife, Norma Purcell, for Curtis Bair without the
       consent of Curtis Bair.  Curtis Bair did not refuse to execute a joinder to the
       shareholders agreement.

40.    At a board and shareholder meeting held by Appalachian Baking Company, the
       shareholders voted to redeem the stock of Lori Green and Robert Green for
       $121,000 and the stock of Jay and Deborah James for $48,000.  Curtis Bair asked
       to be allowed to sell his stock to the company for $203,000.  Francis Purcell voted
       his and Norma Purcell's shares, and the proxy of the Greens against such an
       action and the purchase of Curtis Bair's stock was declined.

41.    On July 22, 2002, the Purcells and the Bairs met at Ted's Restaurant and Francis
       Purcell and Norma Purcell assured the Bairs that if the Purcells are allowed to
       complete the buyout agreement of the Jameses and Greens, they would then see
       that the Bairs are paid the $203,000 for their shares.

42.     Curtis Bair entered into an oral agreement with Francis Purcell acting on behalf of Appalachian Baking Company to sell his fifteen shares of Appalachian Baking Company stock for $203,000.  This oral contract was materially breached.

43.     On August 16, 2002, Patrice Bair was fired after reporting a problem at the restaurant.  She was ordered to not set foot in the restaurant again.  When Curtis Bair returned to work the day after this event, Francis Purcell stated: "I didn't think you would show up given what happened to Patrice."  Curtis Bair continued to work at the restaurant until August 25, 2002, when Francis Purcell fired Curtis Bair and replaced him with Jessica Kiely.

44.     Curtis Bair had a reasonable expectation of employment by Appalachian Baking Company as a minority shareholder of the company.  Both Francis and Norma Purcell were involved in the decision to terminate Curtis Bair's employment and prevented the fulfillment of Curtis Bair's reasonable expectation.  The Purcells terminated the employment of Curtis Bair in an attempt to drive the Bairs out of the business in part because Curtis Bair asserted his rights as a minority shareholder.  This decision had no legitimate business purpose.

45.     On October 5, 2002, the stock belonging to the Robert Green and Lori Green was redeemed for $121,000.  On October 9, 2002, the stock of Jay and Deborah James was redeemed for $48,400.

46.     The other minority shareholders, the Greens and the Jameses, were treated more favorably than Curtis Bair during the shareholder redemption process.  Curtis Bair was excluded from the shareholder redemption process for no legitimate reason.

47.     In January 2003, Francis Purcell presented to Curtis Bair resignation letters from his position as an officer of Appalachian Baking Company and as a member of the Board of Directors of Appalachian Baking Company and asked him to sign them.  Curtis Bair refused.

48.     Between April 2003 and October 2003, the Bairs remained in the Harrisburg area and tried to resolve the dispute, but the conflict worsened.  Francis Purcell's proposals to settle the dispute or compensate Curtis Bair were not made in good faith but rather to further delay Curtis Bair from pursuing legal options

49.     Francis Purcell indicated that he would provide money for them to buy a business. They attempted to locate a business, several were located and presented but they were always rejected by Francis Purcell.  Francis and Norma Purcell also rejected any arbitration or mediation of the dispute.

50.     On October 13, 2003, a telephone conversation occurred between Curtis Bair,

9

Patrice Bair and Norma Purcell.  Norma Purcell stated to Curtis Bair that since the Bairs would not agree with any new settlement demands, then Curtis and Patrice would get nothing and that the Bairs could do nothing about it.  She stated: "[w]hat are you going to do, go and get an attorney?  What is that going to do?  Corky is confident that you will get nothing."

51.     On November 17, 2003, Attorney Sacks wrote to Curtis Bair indicating that Francis Purcell had requested a special meeting of the shareholders and asked Curtis Bair as the secretary to send out notices.  Notices were sent to the Jameses, Bairs, Purcells, and Jessica Kiely.  One purpose of the special meeting was to identify any and all existing shareholder agreements and obligations as to the corporation's paperwork and the requirements for signature.  Attorney Sacks was aware that one point of discussion at this meeting would be to vote Curtis Bair off the Board of Directors and remove him as secretary of the corporation.  On December 8, 2003, Curtis Bair attempted to put items on the agenda for this meeting.  This attempt was rejected.

52.     At the December 12, 2003, combined special meeting, Curtis Bair learned for the first time that Jessica Kiely was a shareholder and attempted to challenge Jessica Kiely's status as a shareholder.  This challenge was unsuccessful.  Francis Purcell indicated that the shareholders agreement was no longer in effect since the Greens and Jameses were no longer shareholders and since Curtis Bair had never signed the agreement and that no other shareholders agreement could be identified as being in effect.  Francis Purcell and Jessica Kiely were elected to the Board of Directors leaving out Curtis Bair as a director and Jessica Kiely was elected as corporate secretary replacing Curtis Bair.  After this meeting Francis Purcell told Curtis Bair "I will not pay you a penny until a Judge makes me."

53.     Curtis Bair's term on the Board of Directors did not expire by its own terms on December 12, 2003, and his service as a board member was terminated in a manner contrary to the existing shareholders agreement.  Curtis Bair had a reasonable expectation as a minority shareholder and party to the shareholder agreement to be a member of the Board of Directors and the actions of Francis Purcell and Norma Purcell prevented the fulfillment of this reasonable expectation.

54.     After the meeting on December 12, 2003, Curtis Bair requested documents from Attorney Sacks and they were provided.  These documents showed that Jessica Kiely had one share of stock transferred to her from Francis and Norma Purcell on December 31, 2001.  Francis Purcell had discussed issuing a share of stock to Jessica Kiely in 2001.  The date of 2001 on this transaction and letters and certificate stubs and share ledger and transfer book were altered so as to make it appear that this share of stock was issued to Jessica Purcell Kiely on December 31, 2002 – after the Jameses and Greens ceased to be shareholders covered by the

shareholders agreement.

55.    In December 2001, Francis Purcell and Norma Purcell transferred a share of stock
       to Jessica Kiely in contravention of the shareholders agreement and the terms of
       the corporate bylaws.  Francis and Norma Purcell then altered or caused someone
       else to alter the corporate records to change the date of the improper transfer from
       2001 to 2002 in an attempt to hide the improper transfer.  This modification was
       not made to correct an earlier clerical error.

56.    In 2003, before the Bairs retained an attorney, yearly sales for the restaurant were
       $1,391,612 with a profit of $173,137.  After the Bairs hired an attorney, 2004
       sales were up to $1,398.796 but profit was only $12,903; 2005 sales were up to
       $1,419,403 but the store reported a loss of $44,107; 2006 sales were $1,382,006
       but profit was only $12,854.  Dividends were never paid to the shareholders.

57.    Dividends were withheld to harm Curtis Bair and not for any proper business
       purpose

58.    Norma Purcell, as a majority co-shareholder, never objected to her husband's vote
       or took any other action to protect the interests of the minority shareholder Curtis
       Bair.

59.    As of May 2nd, 2005, the net worth of Francis and Norma Purcell was $2.1
       million exclusive of the value of their personal residence and holdings in
       Appalachian Baking Company.

60.    Francis Purcell acted intentionally and maliciously to undermine Curtis Bair's
       rights as a minority shareholder.

## II.    DISCUSSION

### A.  Breach of Fiduciary Duties

The legal framework applied by the Court at summary judgment to assess a breach of

fiduciary claim in the context of a closely held corporation is still applicable and was set out as

follows:

Majority shareholders have a fiduciary obligation to minority shareholders of the
"utmost good faith and loyalty."  Orchard v. Covelli, 590 F. Supp. 1548, 1557
(W.D. Pa. 1984), aff'd, 802 F.2d 448 (3d Cir. 1986); see also Bohler-Uddeholm
Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 100-101 (3d Cir. 2001) (A

majority shareholder "is under close scrutiny, and is expected to conform to the highest standards of conduct"); Ferber v. Am. Lamp Corp., 469 A.2d 1046, 1050 (Pa. 1983) ("It has long been recognized that majority shareholders have a duty to protect the interests of the minority").  Therefore, a "policy of corporate governance which has as its objective the denial of benefits to the minority interest runs afoul of this fairness standard and calls to question the majority's fulfillment of its fiduciary duty to the other shareholders." Orchard, 590 F. Supp. at 1556.  This is especially true in a closely-held corporation where shares are not publically traded and a fair market is rarely available. Id. at 1557.  Accordingly, Pennsylvania courts have held that majority shareholders' duty to the minority "prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." Ferber v. American Lamp Corp., 469 A.2d 1046, 1050 (Pa. 1983) (quoting  Hornsby v. Lohmeyer, 72 A.2d 294, 298 (Pa. 1950)).  This does not mean that majority shareholders may never act in their own interest, merely that when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation.  Id. (citing Weisbecker v. Hosiery Wide Patents, Inc., 51 A.2d 811, 814, 817 (Pa. 1947)).  "Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role." Bohler-Uddeholm, 247 F.3d at 100-101.

A majority shareholder may not use the corporate process to deny minority shareholders the right to participate in the corporation or to "exclude minority shareholders from their proper share of benefits accruing from the enterprise[.]"  Viener v. Jacobs, 834 A.2d 546, 556 (Pa. Super. Ct. 2003); see Orchard, 590 F. Supp. at 1556.  A "freeze-out" occurs in a closely-held corporation when a minority shareholder is removed from office or his power or compensation is substantially diminished, in an attempt to exclude the shareholder from any meaningful role in the corporation or deny him benefits from the corporation.  Viener, 834 A.2d at 556 (citing 15 Pa. Cons. Stat. § 1767 comment).  Such an attempt by a majority shareholder to "freeze-out" or "squeeze-out" a minority shareholder constitutes a breach of this fiduciary duty. Tactics employed against a minority shareholder to effect such a "freeze-out" include, but are not limited to: 'generally oppressive conduct, the withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority stockholders, withholding information relating to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholders appraisal rights, failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making.' Orchard, 590 F. Supp. at 1557.  The United States District Court for the Western District of Pennsylvania noted that "[t]he removed minority shareholder is frequently replaced by someone who is closely related to the majority shareholder[, a] practice . . . typical of a consolidation of power . . . ." Id. at 1558.

(Doc. No. 87 at 21-22.)

Appalachian Baking is a closely held corporation, and there is ample evidence that Francis Purcell and Norma Purcell did not satisfy their obligation of the utmost good faith and loyalty to Curtis Bair as a minority shareholder.

### 1.  Withholding Corporate Benefits

One indicator of a classic minority shareholder freeze-out is the extent to which Francis and Norma Purcell misused the corporate process to substantially infringe on Curtis Bair's proper share of corporate benefits.  Between August 25, 2002, and December 12, 2003, Curtis Bair was fired from his position at the restaurant (Factual Finding, ¶ 43)(hereinafter "Finding"), removed as corporate secretary (Finding, ¶ 52), and voted off the board of directors (Id.).  The Court cannot find that there was a legitimate reason for these actions.  Curtis Bair's term on the Board of Directors did not expire by its own terms on December 12, 2003, and his service as a board member was terminated in a manner contrary to the existing shareholders agreement, which provided that he would be a permanent board member as long as he remained a shareholder.  (Findings, ¶¶ 8, 53.)   Further raising the specter of a purposeful corporate freeze-out, Jessica Kiely, the Purcell's daughter, took over Curtis Bair's job at the restaurant and his positions in the corporation after he was removed.  (Findings, ¶¶ 43, 52.)  Appalachian Baking also did not pay any dividends out to its shareholders.  (Finding, ¶ 56.)  Given the threats made by Francis Purcell at the July 3, 2002, confrontation (Finding, ¶ 34), the returns of Appalachian Baking for the relevant years (Finding, ¶ 55), and the Purcells' hostile actions towards Curtis Bair, it is clear that the dividends were withheld to harm Curtis Bair and not for any proper business purpose (Finding, ¶ 57).  As such, the Court finds that Francis and Norma Purcell used

13

their power as majority shareholder to improperly exclude Curtis Bair from his proper share of corporate benefits.

### 2. Appropriating Corporate Assets

Francis and Norma Purcell appropriated corporate assets by accepting "loan payments" on money "loaned" to Appalachian Baking to make up the initial $360,000 shortfall in initial operating capital. The offering to potential investors provided that the Purcells would make up any shortfall by capital investment in the corporation, which could only be recovered by undergoing the formal process of declaring a dividend. (Finding, ¶ 18.) All shareholders would have had a right to a dividend in proportion to their ownership in the company as represented by their number of shares. By loaning the money to Appalachian Baking, the Purcells undermined the legitimate expectation of the investors. The loaned money could be paid back to the Purcells from the company without going through any of the formalities of a dividend and not allowing other shareholders to participate. (Id.) As a loan, it also accrued interest and is considered a corporate obligation. Given this conduct and considering the jury's advisory finding on this issue, the Court also finds that this conduct unfairly disadvantaged the corporation and resulted in an appropriation of corporate assets from Appalachian Baking.

This appropriation also lends further support to the finding discussed above that Francis Purcell purposefully ensured that dividends were withheld to harm Curtis Bair and without a legitimate business purpose. (Finding, ¶ 57.) While the Defendants argue that it was in Francis Purcell's best interest as a majority shareholder to see that Appalachian Baking paid out dividends (Doc. No. 166 at 13), it is clear that under this loan arrangement Francis Purcell could profit from the company without letting Curtis Bair participate.

14

### 3. Access to Corporate Records

Francis Purcell improperly restricted Curtis Bair's access to corporate records.  Francis

Purcell misled Curtis Bair by giving him a copy of a two-page document titled "keys to bylaw

inserts" when he asked for a copy of the bylaws.  (Finding, ¶ 36.)  Further, the corporate attorney

initially denied Curtis Bair's request for a copy of the shareholders agreement in order to get

clearance from Francis Purcell, even though Curtis Bair was a corporate officer and board

member at the time.  (Finding, ¶ 35.)  As such, the Court finds that Francis Purcell improperly

restricted Curtis Bair's access to corporate records.

### 4. Role in Corporate Decision-Making

Finally, Francis and Norma Purcell also excluded Curtis Bair from any meaningful role

in corporate decision-making.  As discussed above, Curtis Bair was ultimately removed from all

positions he held with the company without legitimate reason.  Even before his total removal, the

Purcells made it impossible for Curtis Bair to even effectively participate in board and

shareholder meetings.  This is generally shown by Curtis Bair's inability to take any action at the

board and shareholder meetings, such as the rejection of his attempt to put items on the agenda

for the December 2003 meeting.  (Findings, ¶¶ 51-52.)  Curtis Bair's ability to participate in the

decision-making was also impacted by the difficulty he encountered even in simply gaining

access to certain essential corporate documents, as discussed above.  The Court finds that this

conduct excluded Curtis Bair from any meaningful role in corporate decision-making at

Appalachian Baking.

### 5. Norma Purcell

Though there is some indication in the record that Francis Purcell was generally in

control of business matters, Norma Purcell never objected to her husband's vote or took any

other action as a majority co-shareholder to protect the interests of Curtis Bair.  (Finding, ¶ 58.)

Further, Norma Purcell was personally involved in negotiations for the buy-back of Curtis Bair's

stock (Finding, ¶ 41) and she personally discouraged the Bairs from pursuing their legal rights,

remarking to the Bairs that her husband was confident they would get nothing if they got an

attorney. (Finding, ¶ 50).  The advisory findings and verdict also clearly indicate that the jury

found Norma Purcell played a role in these matters.  As such, the Court finds that Norma Purcell

has also breached her fiduciary duty to Curtis Bair.

As the discussion above shows, this is a clear case of a minority shareholder freeze-out

and a breach of fiduciary duties.  The Court will rule in favor of Curtis Bair on this claim.

### B.  Piercing the Corporate Veil

At summary judgment, the Plaintiffs argued that individual liability should attach to

Norma and Francis Purcell because the circumstances of this case require that the corporate form

– and the protections that this form generally affords shareholders – be disregarded.  (Doc. No.

87 at 16.)  In adjudicating the motion, the Court held that piercing the corporate veil as to Norma

Purcell was not warranted and that material questions of fact remained as to whether liability

should extend to Francis Purcell personally on Counts I and II.  (Id. at 17.)  The legal framework

applied at summary judgment is still applicable, and was set out as follows:

> Pennsylvania generally recognizes that the corporate veil may be pierced
> "whenever it is necessary to avoid injustice."  Rinck v. Rinck, 526 A.2d
> 1221, 1223 (Pa. Super. Ct. 1987).  However, there is a strong presumption in
> Pennsylvania against piercing the corporate veil.  Lumax Indus., Inc. v.
> Aultman, 669 A.2d 893, 895 (Pa. 1994) (quoting Wedner v. Unemployment
> Board, 296 A.2d 792, 794 (Pa. 1972)).  Although there is no definitive test
> for piercing the corporate veil under Pennsylvania law, courts are instructed
> to apply a totality-of-the-circumstances test when determining whether to

impose individual liability on a shareholder.  First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 604 (Pa. Super. Ct. 1991).  In Ashley v. Ashley, 393 A.2d 637 (Pa. 1978), the Pennsylvania Supreme Court set forth the following principles to guide the determination of whether the corporate form should be disregarded and whether one individual or corporation should be deemed the alter-ego of another: 'This legal fiction of a separate corporate entity was designed to serve convenience and justice, and will be disregarded whenever justice or public policy demand and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.  We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate entity may properly be disregarded.  Ashley, 393 A.2d at 641 (citations omitted); see Ragan v. Tri-County Excavating, 62 F.3d 501, 509 (3d Cir. 1995).  The Third Circuit has held that the factors to be considered under Pennsylvania law with respect to the alter-ego theory include, but are not limited to: failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; siphoning funds from the corporation by dominant shareholders; nonfunctioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization. Eastern Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 333 n.7 (3d Cir. 2000).  The Third Circuit observed that: 'Pennsylvania, like New Jersey, does not allow recovery unless the party seeking to pierce the corporate veil on an alter ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham. . . .  In other words, both Pennsylvania and New Jersey require a threshold showing that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons.' Eastern Minerals, 225 F.3d at 334 (quoting Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 14-15 (3d Cir. 1990)).  Notably, the fact that a corporation's stock is owned entirely by one person, Lumax, 669 A.2d at 895 (citing College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 207 (Pa. 1976)), or owned by members of the same family, Warren v. Motion Picture Machine Operators, 118 A.2d 168, 170 (Pa. 1955), does not make a corporation any less valid.

(Id. at 16-18.)

    As with the breach of fiduciary duty claim, there is ample evidence to justify the Court

piercing Appalachian Baking's corporate veil and holding Francis Purcell personally liable for

the damages awarded by the jury on Counts 1 and 2 against Appalachian Baking.  This is evident from the extent to which Francis Purcell used his control over Appalachian Baking to further his own personal interests.

Much of the discussion above finding a breach of fiduciary duty is applicable in this analysis as well.  Francis Purcell's specific purpose was to force the Bairs out of the company. He used his influence as majority shareholder and with other corporate employees to advance that agenda without regard for the best interests of Appalachian Baking.  This involved the improper refusal to declare dividends and the appropriation of corporate assets.

Francis Purcell is also responsible for a selective and purposeful failure to follow corporate formalities.  The original shareholders agreement was replaced with an amended agreement with no notice or consent from Curtis Bair, who was no longer listed as an original party to the agreement.  (Findings, ¶¶ 38-39.)  Further, a share of stock was transferred to Jessica Kiely in contravention of the existing shareholders agreement.  (Findings, ¶¶ 54-55.)  The corporate records were then altered in an attempt to legitimize this improper transfer.  (Id.)

Given the above and considering the totality of the circumstances of this case, the Court finds that piercing the corporate veil is appropriate to avoid injustice.

**C. Damages**

**1. Actual**

Where a minority shareholder has been squeezed out of a closely held corporation, one way to measure damages is to place a fair value on the minority shareholder's ownership interest in the closely held corporation before the squeeze out.  See e.g., Viener, 834 A.2d at 558; Orchard, 590 F. Supp. at 1560.  In assessing the fair value, the fact-finder may consider all

relevant circumstances and the different methods by which one may assign value to a portion of a business.  See id.

In this case, some pertinent methods of valuation to consider are book or fair market value.  Additionally, the shareholders agreement in this case contained a certificate of value that establishes a value of $17,000 per share in Appalachian Baking.  (Finding, ¶ 8.) Contemporaneous transactions also provide guidance to determine the value of Curtis Bair's ownership interest.  (Findings, ¶¶ 11, 45.)  In weighing these options, the jury clearly found that the best method to assess fair value under all the circumstances of the case was to rely on the certificate of value contained in the shareholder agreement.  This is evident from their valuation of Curtis Bair's 15 shares of stock at $255,000, which figure is arrived at after taking the 15 shares multiplied by the $17,000 value established by the certificate of value.  Considering the findings above and the evidence presented at trial, the Court finds that the jury's determination on this issue is appropriate under the circumstances and will adopt the jury's finding that the fair value of Curtis Bair's shares and ownership interest was $255,000.  Because the jury also awarded $203,000 on the breach of stock-buy agreement, the Plaintiff suggests "this would authorize a judgment for the difference between the $255,000 and the $203,000 in the buyout agreement, or $52,000."  (Doc. No. 171 at 17.)  The Court agrees, and finds that Curtis Bair suffered $52,000 in damages in excess of the amount promised in the stock buy-out agreement due to the loss of his ownership interest.

Having established the fair value of Curtis Bair's ownership interest, the Court may also award a minority shareholder excluded by a freeze-out a six percent per annum pre-judgment interest on his ownership amount from the date the squeeze-out began if such award would be

equitable under the circumstances.  See Orchard, 590 F. Supp. 1560.  The Court finds that an award of pre-judgment interest is appropriate in this case to fully redress the breach of fiduciary duty.  The purposeful freeze-out of Curtis Bair had begun in earnest by July 3, 2002.  (Finding, ¶ 34.)  As such, pre-judgment interest at six percent per annum on Curtis Bair's $255,000 ownership interest from July 3, 2002 to the date of judgment will be awarded.

The fact-finder may also award compensatory damages if the Plaintiff has established by evidence such facts as will furnish the basis for the legal assessment of damages.  Viener, 834 A.2d at 557 (citing Gordon v. Trovato, 234 A.2d 653, 657 (Pa. Super. Ct. 1975)).  To ensure that the damages are not merely based on conjecture or speculation, the plaintiff must show that the injury would not have occurred without the Defendant's acts and that the injury was a direct result or reasonably probable consequence of the Defendant's acts.  See Trovato, 234 A.2d at 657.

In becoming a shareholder of Appalachian Baking Company, Curtis Bair took a lower salary (Finding, ¶ 22), gave up other lucrative job opportunities (Findings, ¶¶ 14, 15, 16), moved across the country (Findings, ¶¶ 20, 21), and incurred significant expenses while attempting to resolve the dispute amicably (Finding, ¶¶ 48-49).  He was also prematurely terminated from his position at Appalachian Baking Company.  (Finding, ¶ 43).  The Court finds that these injuries would not have occurred if not for the Defendants' breach of fiduciary duties.  Based on these many sources of injury, the Court will adopt the jury's advisory award of $150,000.

## 2. Punitive

Punitive damages may be awarded for outrageous actions that demonstrate willful, wanton, or reckless conduct undertaken due to a defendant's evil motive or reckless indifference

to the rights of others.  Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005)

(quoting Feld v. Merriam, 485 A.2d 742, 747 (1984)).  The damages are appropriately awarded

to punish a defendant for this outrageous conduct or to deter the defendant and others like the

defendant from committing such conduct in the future.  Viener v. Jacobs, 834 A.2d 546, 560 (Pa.

Super. Ct. 2003).  "The degree of reprehensibility is the primary indicator of the reasonableness

of a punitive damages award.  The reprehensibility inquiry takes into account that some wrongs

are more blameworthy than others."  Id. (quoting Judge Tech. Servs. v. Clancy 813 A.2d 879,

888-889 (Pa. Super. Ct. 2002)).  The state of mind of the actor pursuing this reprehensible

conduct is vital, he must be acting or failing to act intentionally, recklessly, or maliciously.

Snead v. Soc. for Prevention of Cruelty to Animals of Pennsylvania, 929 A.2d 1169, 1184 (Pa.

Super. Ct. 2007) (quoting Hutchinson ex rel. Hutchison v. Luddy, 896 A.2d 1260, 1265 (Pa.

Super. Ct. 2006)).  Beyond the character of the Defendant's conduct, the Court can also consider

the nature and extent of the harm when determining whether punitive damages are appropriate.

Id.  Another consideration is the extent of the personal wealth of the defendant, though

"evidence of personal wealth is not mandatory in the determination of punitive damages."  Id. at

561; see also, Vance v. 46 and 2, Inc., 920 A.2d 202, 207 (Pa. Super. Ct. 2007) ("In fact, we

rejected the defendant's position that wealth is a necessary prerequisite . . . the polestar for the

jury's assessment of punitive damages is outrageous conduct of the defendants.")

### a.  Francis Purcell

Francis Purcell intentionally engaged in outrageous and reprehensible conduct in

violating Curtis Bair's rights as a minority shareholder.  As discussed above, the record amply

demonstrates that Francis Purcell manipulated the corporate process to freeze-out Curtis Bair

without regard to his rights as a minority shareholder.  This breach of fiduciary duty is particularly reprehensible, however.  The intentional and malicious character of Francis Purcell's conduct is aptly demonstrated by his careful subterfuge to disguise the freeze-out process in altering the original shareholder agreement (Findings, ¶¶ 38-39) and surreptitiously altering corporate records of a transfer of stock to his daughter in contravention of the shareholder agreement and bylaws of the company (Findings, ¶¶ 54-55).

Beyond ignoring Curtis Bair's rights as a minority shareholder and manipulating the corporate process, Francis Purcell utilized his power, status, and authority to marginalize and intimidate Curtis Bair, mainly in an effort to stop him from contacting an attorney to ascertain or enforce his rights.  He used his relationship with the corporate attorney to facilitate the freeze-out.  (Findings, ¶¶ 35, 51.)  Francis Purcell also threatened to destroy the Bairs and eliminate the value of Curtis Bair's shares if Curtis Bair got an attorney involved in their dispute.  (Finding, ¶ 34.)  Francis Purcell even fired Curtis and Patrice Bair from their jobs at the restaurant because Curtis Bair was attempting to assert his rights as a minority shareholder.  (Findings, ¶¶ 43-44.)  After Curtis Bair's final shareholder meeting, Francis Purcell warned Curtis Bair that he would not pay him a penny until ordered by a judge. (Finding, ¶ 52.)  Given this last statement and other conduct, it is also a fair inference from the record that Francis Purcell's proposals to settle the dispute or compensate Curtis Bair were not made in good faith but rather to further delay Curtis Bair from pursuing legal options.  (Findings, ¶¶ 41, 48-50.)

As the court held in *Viener*, this type of conduct by a majority shareholder is particularly reprehensible because minority shareholders are especially vulnerable:

> As the facts presented above demonstrate, Jacobs' actions (with Rush's assent) led to the usurpation of Viener's right to participate in

the governance of a corporation that Viener co-founded. As the trial court found, Jacobs' misuse of corporate funds and property coupled with his failure to undertake sufficient measures to procure the continued success of NGN led to its ultimate failure. We agree with the trial court's conclusion that minority shareholders in closely-held corporations are particularly vulnerable to this type of wanton neglect and bad faith, and it is therefore necessary to punish this behavior to ensure that it will not occur in future cases.

Viener, 834 A.2d at 561.  Likewise in the present case, Curtis Bair was clearly vulnerable.  And, as this prolonged case has shown, these violations of fiduciary duty can be very difficult and expensive to expose, especially where the majority shareholder has taken special care to disguise his conduct and prevent the institution of legal action.  Accordingly, punitive damages are especially appropriate here not only to punish Francis Purcell but to deter others in his position from abusing their authority and ignoring the rights of minority shareholders.

As of May 2, 2005, Francis and Norma Purcell's net worth was $2.1 million exclusive of their personal residence and interests in Appalachian Baking Company.  (Finding, ¶ 59) The Court finds that this net worth is sufficient to sustain the punitive award.  Even assuming *arguendo* that this personal wealth was not sufficient, evidence of personal wealth is not mandatory in determining a punitive damage award but merely a potential factor to consider.  In this case, the Court finds that punitive damages are appropriate even absent evidence of personal wealth based on the outrageous conduct of Francis Purcell.

Accordingly, the Court finds that Francis Purcell intentionally engaged in outrageous, reprehensible conduct and that punitive damages are necessary to punish and deter him and others from engaging in this behavior in the future.  The Court also finds that the jury's advisory award of $375,000 is an appropriate amount under the circumstances to satisfy these objectives of punishment and deterrence and is also proportional to the overall award of actual damages.

23

As such, the Court will adopt the jury's advisory verdict and award.

### b.  Norma Purcell

As discussed above, Norma Purcell took no action as a majority co-shareholder to protect Curtis Bair's rights.  Though the Defendants argue that she had no personal role in the matter, it is clear that she involved herself in the negotiation process for the buyback of Curtis Bair's stock.  (Finding, ¶ 41.)  She also joined in her husbands attempts to stop Curtis Bair from hiring an attorney: personally threatening that they would get nothing if they hired an attorney and to take a settlement.  (Finding, ¶ 50.)  The jury also determined that punitive damages were appropriate and found that Norma Purcell had maliciously violated Curtis Bair's rights.  Taking the advisory findings and verdict as a whole, it is clear the jury found Norma Purcell to be equally responsible and blameworthy for this conduct.

Accordingly, the Court finds that Norma Purcell intentionally engaged in outrageous, reprehensible conduct and that punitive damages are necessary to punish and deter her and others in her position from engaging in this behavior in the future.  The Court also finds that the jury's advisory award of $375,000 is an appropriate amount under the circumstances to satisfy these objectives of punishment and deterrence and is also proportional to the overall award of actual damages.  As such, the Court will adopt the jury's advisory verdict and award.

## III.    CONCLUSIONS OF LAW

Based on the foregoing findings of fact and law, the Court makes the following conclusions of law:

1.    Both Francis Purcell and Norma Purcell breached their fiduciary duties to Curtis Bair as a minority shareholder in Appalachian Baking Company.

2.      Piercing the corporate veil of Appalachian Baking Company to hold Francis
        Purcell individually liable on Counts I and II is justified in this case to avoid
        injustice.

3.      Curtis Bair suffered $52,000 in damages in excess of the amount promised in the
        stock buy-out agreement due to the loss of his ownership interest in Appalachian
        Baking Company.

4.      An award of pre-judgment interest at six percent per annum on Curtis Bair's
        $255,000 ownership interest from July 3, 2002 to the date of judgment is
        necessary to fully redress this breach of fiduciary duty.

5.      Curtis Bair has further suffered actual damages in the amount of $150,000 beyond
        the loss of his ownership interest as a result of this breach of fiduciary duty.

6.      Francis Purcell and Norma Purcell intentionally engaged in outrageous,
        reprehensible conduct and that punitive damages are necessary to punish and
        deter them and others from engaging in this behavior in the future.  Punitive
        damage awards in the amount of $375,000 against Francis Purcell and $375,000
        against Norma Purcell are appropriate under the circumstances to satisfy the
        objectives of punishment and deterrence and are also proportional to the overall
        award of actual damages.

## IV.    ATTORNEY FEES

### A.  Fee Petition

It is well established under the "American Rule" that ordinarily "the prevailing party may

not recover attorneys fees as costs or otherwise."  Alyeska Pipeline Service Co. v. Wilderness

Society, 421 U.S. 240, 245 (1975).  This general rule is subject to several exceptions, including

the two raised by the Plaintiffs in this case: fee shifting statutes and bad faith.  See id. at 257-

258.    In application of these exceptions, "the most useful starting point for determining the

amount of a reasonable fee is the number of hours reasonably expended on the litigation

multiplied by a reasonable hourly rate."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

Performing this calculation will provide the "lodestar" figure, which is presumed to be the

reasonable fees for the matter.  Rode v. Dellaciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).  The

party seeking the attorney fees has the burden to prove that the requested attorney's fees are

reasonable, which initially requires the fee petitioner to "submit evidence supporting the hours

worked and the rates claimed."  Id. at 1183; E.E.O.C. v. Federal Express Corp., 537 F. Supp. 2d.

700, 721 (M.D. Pa. 2005) (citing Hensley, at 433).  This fee petition must be detailed and

specific enough for the district court to ascertain whether the hours claimed are unreasonable for

the work performed and should include "some fairly definite information as to the hours devoted

to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent

by various classes of attorneys, e.g., senior partners, junior partners, associates."  Rode, 892 F.2d

at 1190. (quoting Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanatory

Corp., 487 F.2d 161, 167 (3d Cir. 1973)).  But, "it is not necessary to know the exact number of

minutes spent nor the precise activity to which each hour was devoted nor the specific

attainments of each attorney."  Id.  Additionally, the Supreme Court in *Hensley*, a case heavily

relied on by Plaintiffs, held that the fee petitioner should exercise "billing judgment" in multi-

claim litigation and "maintain billing time records in a manner that will enable a reviewing court

to identify distinct claims."  Hensley, 461 U.S. at 437.

The Third Circuit has held that fee petitioners carried their initial burden where the

submitted time-sheet indicated the activity and date that it took place, such that there is enough

information to ascertain what hours were devoted to various activities.  See Washington v.

Philadelphia County Ct of C.P., 89 F.3d 1031, 1038 (3d Cir. 1996).  On the other hand, the fee

petitioner has not met his burden where the fee petition conveys only monthly totals of claimed

hours.  Keenan v. City of Philadelphia, 983 F.2d 459, 473 (3d Cir. 1992) ("For [September 1987

to October 1989], the plaintiffs submitted only monthly cumulative totals of Sprague's hours, claiming a total of 631.5 hours.  Faced with these monthly summaries, the trial court could only have speculated as to whether the hours claimed were reasonable for the work performed.")

In this case, the fee petition submissions by Plaintiffs are sufficient to support the claimed hourly rates but insufficient to adequately demonstrate the hours worked.  As for hourly rates, the Plaintiffs' attorney James J. West has submitted his resume and qualifications along with a declaration from attorney David R. Fine, providing evidence that the claimed hourly rates of $225 per hour for himself and $175 per hour for co-counsel Robert R. Long, Jr. are reasonable for the legal market in this district.  (Doc. No. 162, Ex.1-2.)  The Defendants admit that the hourly rates appear reasonable (Doc. No. 167 ¶ 8) and have submitted no contrary evidence or objections, so the Court will hereafter consider the claimed rates reasonable.  See e.g., Bell v. United Princeton Properties, Inc., 884 F.2d 713, 719 (3d Cir. 1989); Cunningham v. City of McKeesport, 753 F.2d 262 (3d Cir. 1985).

The fee petition is not sufficient to carry the petitioner's initial burden with regard to the details of the hours worked, however.  The computer generated submissions provide only monthly cumulative totals of hours worked and expenses.  (Doc. No. 162-2 Ex. B-C.)  While the affidavits shed some light on which attorney was working during which time period, there is almost no indication of what hours were devoted to which general activities.  The submission as to hours billed by Robert Long, Jr. after June 2006, though modest in amount, consists of only a reproduced e-mail message that claims a total bill of $32,083.45 for a period of two years.  (Id., Ex. D.)  Finally, though Plaintiffs argue that the multiple claims in this case intermingle under

the *Hensley* rationale,[2] they have not provided records that would assist the Court in determining this issue as counseled in *Hensley*.  See Hensley, 461 U.S. at 437  As such, the fee petition is inadequate for the Court to ascertain whether the hours claimed are reasonable for the work performed.

When a party submits an inadequate fee petition, the district court has options.  For one, the Court has discretion to deduct hours when the fee petition is inadequate to document the hours claimed.  Rode, 892 F.2d at 1183 (citing Hensley, 461 U.S. at 433).  In limited circumstances, an inadequate fee petition will even justify a total denial of fees.  Pawlak v. Greenawalt, 713 F.2d 972, 978 (3d Cir. 1983) (quoting Jordan v. United States Dept't of Justice, 691 F.2d 514, 518 (D.C. Cir. 1982)).  The district court may also afford the petitioners a further opportunity to adequately document their fees.  See Keenan, 983 F.2d at 474.

Under these circumstances, the Court will grant the Plaintiffs leave to supplement their fee petition to offer the appropriate level of detail.  The fee-shifting statute at issue is Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq*., which provides for a mandatory award of reasonable attorney fees as a matter of entitlement.  43 P.S. § 260.9a(f); Oberneder v. Link Computer Corp., 449 A.2d 720, 722 (Pa. Super. Ct. 1996).  Given the policies underlying this statute, the Court finds that it is reasonable to allow the Plaintiffs to supplement the fee petition to ensure Patrice Bair is afforded the full measure of recovery to which she is entitled.  If the Plaintiffs are unable or unwilling to provide more detailed records, they shall inform the Court that they wish to stand by the fee petition as filed.  In that case, the Court will

---

[2]  The Court notes that nothing in this opinion should be construed as a determination on this issue.  The Court will reserve ruling on the issues raised in the motion for attorney fees until the Plaintiffs have met their initial burden to submit adequate records in their fee petition.

be forced to consider the extent to which the fee award should be decreased to ensure that the claimed hours are reasonable.  See Rode, 892 F.2d at 1183

### B.  Bad Faith

In their motion for attorney fees, Plaintiffs have presented argument that Curtis Bair is entitled to an award of fees under the Court's equitable powers and the bad faith exception to the American Rule.  (Doc. No. 162 at 7-14.)  The Defendants refused to respond to that argument because "the Court has not yet determined whether either Francis Purcell and/or Norma Purcell have breached their fiduciary duty to Curtis Bair, and as such, a motion requesting attorneys' fees on that claim is not ripe for determination."  Now that the Court has made this determination, the Defendants are directed to respond to the Plaintiffs' arguments that the Court should award Curtis Bair attorney fees under its equitable jurisdiction.

## V.   TIME FOR APPEAL

Under these circumstances, the Court finds that it is appropriate to suspend the finality of the merits judgment for purposes of appeal until resolution of the pending motion for attorney fees under Rule 58(e), which provides:

> Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees.  But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

Fed. R. Civ. P. 58(e).  Accordingly, time for appeal from this judgment will begin to run from when Plaintiffs' motion for attorney fees (Doc. No. 161) is resolved.

## VI.   CONCLUSION

For the foregoing reasons, the Court will instruct the Clerk of Court to enter judgment in favor of Plaintiff Curtis Bair on his breach of fiduciary duty/shareholder oppression claim. Because this claim is now decided, the Clerk of Court will also be instructed to enter judgment on the remaining claims resolved by the jury's verdict.  The Plaintiffs' motion for attorney fees and costs (Doc No. 161), is not currently sufficient for the Court to exercise its discretion in assessing the motion.  As such, the Court will reserve ruling on the motion until Plaintiffs have an opportunity to supplement their petition.  The Court will further exercise its discretion under Rule 58(e) such that time for appeal will run from the entry of an order entirely disposing of the motion for attorney fees.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CURTIS BAIR, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION NO. 1:04-CV-1357** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **FRANCIS PURCELL, et al.,** | : | |
| | : | |
| **Defendants** | : | |

<u>ORDER</u>

**AND NOW**, this 17th day of March 2009, in accordance with the Court's findings of fact

and conclusions of law set forth in the memorandum opinion filed herewith, **IT IS HEREBY**

**ORDERED THAT**:

1.      The Clerk of Court is directed to enter judgment for Curtis Bair in accordance
        with the jury verdict (Doc. No. 158) on Counts I (Breach of Stock Buy-Out
        Agreement), and II (Employment Contract/Additional Consideration) in the
        amount of $203,000.  Francis Purcell shall be personally liable for this amount.

2.      The Clerk of Court is directed to enter judgment for Patrice Bair in accordance
        with the jury verdict (Doc. No. 158) on Count VII (Wage Payment and Collection
        Law) in the amount of $500.[3]  Appalachian Baking Company and Francis Purcell
        are liable for this amount.

3.      The Clerk of Court is directed to enter judgment for Curtis Bair on Count III
        (Breach of Fiduciary Duties).  This includes an award of $202,000 in actual

---

[3] The jury's verdict is that Appalachian Baking Company and Francis Purcell failed to timely pay Patrice
Bair $855.19 in wages and did not have a good-faith basis to dispute their obligation to pay these wages.  The
Pennsylvania Wage Payment and Collection Law provides:

> Where wages remain unpaid . . . and no good faith contest or dispute of any wage
> claim . . . exists accounting for such non-payment, the employee shall be entitled
> to claim, in addition, as liquidated damages an amount equal to twenty-five percent
> (25%) of the total amount of wages due, or five hundred dollars ($500), whichever
> is greater.

43 P.S. § 260.10.  Because 25% of $855.19 is less than $500, Patrice Bair is entitled to $500 dollars on this claim.

damages and an award of pre-judgment interest at six percent per annum on Curtis Bair's $255,000 ownership interest from July 3, 2002 to the date of judgment.  Francis Purcell and Norma Purcell are liable for these amounts. Additionally, this includes an award of $375,000 in punitive damages against Francis Purcell and $375,000 in punitive damages against Norma Purcell.

4.      The Plaintiffs are directed to supplement their fee petition in support of their motion for attorney fees (Doc. No. 161) such that the Court can ascertain whether the hours claimed are reasonable for the work performed within twenty (20) days of the date of this order.  If the Plaintiffs are unable or unwilling to supplement the petition, they shall inform the Court that they wish to stand by the fee petition as filed

5.      The Defendants are directed to respond to the Plaintiffs' arguments that the Court should award Curtis Bair attorney fees under its equitable jurisdiction (Doc. No. 162 at 7-14) within twenty (20) days of the date of this order.  Any brief in reply to matters argued in the Defendants' response shall be limited to 2000 words.

6.      Time for appeal will begin to run from the time when Plaintiffs' motion for attorney fees (Doc. No. 161) is finally resolved pursuant to Rule 58(e) of the Federal Rules of Civil Procedure.


 s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania